IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------X

RAYTHEON CORPORATION, :

Plaintiff, :

v. : No. 05-448C

UNITED STATES OF AMERICA, :

Defendant. :

---------------------------------X

Washington, D.C.

Thursday, December 14, 2006

Deposition of TERENCE MURPHY, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by DENNIS A. DINKEL, a Notary Public in and for the District of Columbia, taken at the offices of the U.S. Department of Justice, 1100 L Street, N.W., Washington, D.C. at 9:01 a.m., Thursday, December 14, 2006, and the proceedings being taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed under his direction.



APPEARANCES:

On behalf of the Plaintiff:

EXHIBIT

3

KAREN L. MANOS, ESQ.
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Phone: 202-955-8500

On behalf of the Defendant:

C. COLEMAN BIRD, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530
Phone: 202-307-0453

LAWRENCE S. RABYNE, ESQ.
Defense Contract Management Agency
1523 West Central Road
Arlington Heights, IL 60005-2451
Phone: 224-625-8212

P R O C E E D I N G S

Whereupon,

TERENCE MURPHY,



residing at 26 Patricia Road, Peabody, Massachusetts 01960, was called as a witness by counsel for DEFENDANT, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. BIRD:

Q. Good morning.

A. Good morning.

Under rule 30, we are entitled -- the government was entitled to request that -- to serve with its 30(b)(6) notice a request for the production of documents.

That was part of Defendant's Exhibit No. 1 for identification and was served by happened on November 13; and as a result, the response was due yesterday, December 13.

We did not receive any response.

Do you have any response with you, sir?

A. No. I was not asked -- to produce documentation.

MS. MANOS: I would like to respond. The defendant's notice of deposition was actually served by hand on the 14th not on the 13th. The response is due today. The response will be served today. It was. That's when I signed for it. The response for documents was made pursuant to rule 34. We will respond pursuant to rule 34 with a response before close of business today.

MR. BIRD: Well, to correct the record, I served that by hand. I served it at your mail room at approximately 6:30 p.m. on November 13. The response was due yesterday. That's why it called for an a response within 30 days which was yesterday; but ^ -- to be clear,



you are not producing any documents today.

MS. MANOS: No. We are going to serve a written response pursuant to rule 30(b)(4) today.

MR. BIRD: We'll most likely have to take this up with the court, but we'll go as far as we can today.

THE WITNESS: All right.
BY MR. BIRD:
Q. Mr. Murphy, could you tell me what your duties and responsibilities were as assistant controller for government accounting at Raytheon?
A. It was primarily to provide guidance to the businesses and to the corporation relative to CAS and FAR matters, proposal support in instances to the businesses.
Q. And you held the position as assistant controller for government accounting for, I think you said, for five years. That would mean you got that position in roughly the start of 2000?
A. That's correct. I also handled a portion of Raytheon Company's restructuring.
Q. What portion was that?
A. Raytheon went through a major restructuring beginning in 1999. Restructures are amortized over five



years. We prepared out of my group the final submission. We had a -- what we did when the restructuring was coming to a close in the three phases of restructuring at Raytheon, we went through a re-review of the costs incurred under the restructuring. DCAA ^ ck went through a final audit so we could close out the amortized right structuring costs.
Q. And were you in charge of that effort?
A. Yes. ^ ^
Q. Could you describe, Mr. Murphy, your educational background since high school?
A. I graduated from Saint Anselm College in New

Hampshire in 1965, received a master's degree in business from Boston College in 1970 I believe, and went through the advanced management program at Raytheon Company and the financial management development program at Raytheon.

Q. What was your degree in from Saint Anselm's?

A. Business.

Q. And apart from -- was it an MBA that you got from Boston College?

A. Yes.

Q. Apart from your MBA and degree from Saint Anselm's, do you have any other degrees?



A. No.

Q. Any other formal or informal education other than the management programs that you described at Raytheon?

A. No.

Q. What was your first job upon graduation from college?

A. I worked in a factory for approximately nine months and joined Raytheon in February of 1966.

Q. Did you remain with Raytheon throughout the rest of your career?

A. Yes.

Q. In what capacity did you work when you were first employed by Raytheon?

A. I was in a budgets and planning organization.

Q. And what was your next -- what was your position in the budget and planning organization?

A. Just an analyst.

Q. What was your next position within the Raytheon organization?
A. From there, I went on to the financial management development program.
Q. Tell me about that program. How long does that



last?
A. Two years.
Q. Is it a full-time program or is it --
A. No.
Q. -- part time with other work --
A. It's a full-time program. It is still in existence. They call it financial management leadership program today. The term has changed. They recruit at colleges. I happened to be in the company at the time. They took a few folks from the company. Primarily it is pretty much pipe that come out of colleges, they go to BC, colleges across the country now ^ and recruit. It is a rotational program. They put individuals into the ^ various business segments in the -- in different financial organizations and they will either do a six-month -- usually they spend anywhere from -- some people spend the full two years in a given facility.

Other folks spend a year in one facility and another year in another facility. Though usually rotate them on a six-month basis. The one I was on was a six-month assignment. They would change. You would end up with four assignments over a period of two years.

Q. How many hours would you estimate you spent in preparation to testify, including all these activities that



you've described?

A. We spent yesterday afternoon, which is probably about four hours.

I spent -- let me think. I made two trips to corporate: What happened is we talked about other things.

Q. Good to see the old gang?

A. Yes. Then they have questions. You think about this. Maybe four or five hours at corporate.

Q. Total, not just per visit?

A. Correct. Then some of the material, I had taken some home to read. Probably two or three hours worth of that. You know, as best we can get.

Q. You had discussions with Mr. Cann, were those included in your time in corporate?

A. Yes.

Q. The total I get is 10 to 11 hours?

A. If that's what that adds up to.

Q. Four hours yesterday, four hours at corporate, three to four hours reviewing stuff at home?

A. That's probably about right.

Q. When you went to corporate, you said you discussed matters with Mr. Cann.



Did you discuss them with anyone else at

going on?
A. It was in November.
Q. Was it before Thanksgiving or after?
A. Thanksgiving was?
Q. I think it was like November 23, maybe?
A. I thought it was afterwards.
Q. Was it the week of Thanksgiving or waits the following week?
A. I think it was the following week. I know they're not open after Thanksgiving day.
Q. Your best memory is sometime -- I think Monday



the 27th?
A. I think it was in that week.
Q. When you read the notice, did you have any questions?
A. Not really. I just read through it.
Q. Okay. Would you turn, Mr. Murphy, to paragraph 6 of schedule A of the notice of deposition?
That's on page -- the last page of schedule A.
A. Yes.
Q. One of the subject matters that Raytheon is required to provide a designated representative to testify about at today's deposition is paragraph 6 which reads, "All efforts made by, or on behalf of, plaintiff to search for, locate, and produce documents that are responsive to schedule' B' of this notice."
^ could you tell me, sir, what efforts were made by, on behalf of Raytheon to search for, locate, and

produce documents responsive to schedule B?

A. I was not asked to provide any information for this schedule B.

Q. I understand that, sir; but let me ask you: Can you tell me anything about any efforts that were made by



Raytheon to search for, locate, or -- and produce documents responsive to schedule B?

A. To the best of my knowledge, all the information was available, and had been previously provided.

Q. No. Reply question -- so do you know whether anyone looked for any documents responsive to schedule B?

A. I don't know. I didn't.

Q. You did not?

A. No, sir, I did not.

Q. You have no knowledge about whether anybody else did; is that true?

A. That's correct.

Q. So is it fair to say that the Raytheon's testimony through its designated representative, that would be you, in response to paragraph 6 is that no efforts were made to search for, locate, or produce documents responsive to schedule B in response to this notice?

A. I win say that. I would say I didn't.

Q. And you don't know if anyone else did?

A. I don't know.

Q. Did you ask anyone whether anyone else made any efforts to search for, locate, or produce responsive

A. I believe the base plan are hourly employees. That's my belief.

Q. And the salaried plan are salaried employees?

A. That's my understanding.

Q. Were these plans specific to the Raytheon Aerospace segment?

A. I believe so.

Q. So there was a plan that covered, for example, the salaried plan covered salaried employees of Raytheon Aerospace and no other -- no employees of any other segment or unit of Raytheon; is that right.



A. That's my understanding.

Q. Why are there in pension costs listed prior to -- in the case of the salaried, in either case, prior to 1988 ^ ?

A. This is all we were -- this is all that was provided to us by Raytheon Aerospace when we put this together.

Q. Did you or anyone else on behalf of Raytheon ask Raytheon Aerospace for years prior to 1988?

A. We asked them for whatever information they had relative to pension costs, and this is what we received.

Q. My question, sir, is whether you or anyone else at Raytheon ever specifically said in words or substance, thanks for the information from 1988 on. Do you have anything for anything before 1988?

A. I'm sure we did.

Q. Is that because you recall asking that or

because you just think that might have happened?

A. Well, I believe what we did -- and I was involved in a fair amount of this, we asked them to provide us whatever history they had own pension costs. So in the course of the conversation, I would presume that if they



gave us this and said this is as far back as we had, we said okay, if that's all you have, that's all you have.

Q. Do you know when that request was made?

A. No.

Q. Was it in preparation of the January 24, 2005 claim we've marked as Defendant's Exhibit No. 2?

A. These were put together prior to that claim.

Q. Do you know approximately how many months or years prior to that claim?

A. No. There's probably documentation somewhere that you have that have previous submissions to DCA that have this information in it.

Q. Is it your testimony as Raytheon's designated representative that Raytheon has no information regarding pension costs allocated to the Raytheon Aerospace segment for any year prior to 1988?

A. I am not aware of any.

Q. And as far us you know, Raytheon is not aware of any?

A. Correct.

Q. What information do you have -- strike that.

What information does Raytheon have as to how

page, and the next two pages have calculation dieted for the Richardson/Waco pension plan and for the RTIS pension plan, are those the three pension plans that covered employees of the AIS segment?

A. That is reply understanding.



Q. Were there any other pension plans that covered those employees of those segments?

A. I do not believe so.

Q. If you would focus on the -- I guess the second page of the attachments the one headed green reconcile/hourly calculations, pension plan details?

A. Yes.

Q. You have depicted that information dating back to 1972?

A. Yes.

Q. For a total contributions and a total contributions for all years of 172,249,066.

See that?

A. Yes.

Q. What is the source of these numbers in that -- by the way, that is column A on the page -- is that right?

A. Yes.

Q. What is the source of those numbers?

A. DCAA.

Q. Do you know why it was that DCAA came to provide those numbers?

A. We solicited DCAA's assistance when we were

putting threes pension closing adjustments together. They ultimately came up with contributions for the -- for AIS.

Q. Is the reason that you solicited this assistance from DCAA that Raytheon itself did not have any of this information?

A. We solicited both. AIS did not provide anything that I can recall; and DCAA then provided this information.

Q. AIS was sold, as I understand it, in March of 2002 to a company called L-3 Communications, Inc.; is that right?

A. I thought it was 2001. But I could be wrong. The only reason I say that, unless there was no -- unless there was no pension contribution in 2002. I'm just looking at where this stopped.

Q. It's quite possible I copied the date wrong. Either 2001 or 2002; is that right?

A. Yes. It was purchased by L-3.

Q. Did -- do you know whether Raytheon or anyone acting on behalf of Raytheon made any effort to contact L-3 Communications in order to obtain information regarding pension costs total pension costs for any prior year or the allocation of such costs for any prior year?



A. Yes.

Q. What was done?

A. I contacted L 3.

Q. Who did you call?

A. I talked with two people at the time down there.
Roger Travers ^ and I can recall talking to a David Bench.
Q. Could you spell that?
A. B-e-n-c-h.
Q. And when did you have these contacts?
A. Probably -- again without looking at documentation, because there is a little bit of correspondence, 2004, sometime in '04 or prior to that.
Q. What did you learn?
A. Well, what we did get from AIS were some -- were some sales participation numbers DCAA as I said provided the total pension contributions.
Q. Column B which is entitled participation, that's -- the source of those numbers is L 3 communications?
A. Yes. For the years 1994 through 2001.
Q. For the year 19712 through 1993 -- a 21 year period --
A. Correct.



Q. -- they all have the same participation percentage of 7.836 percent?
A. Which was an average of the Richardson, Waco and Greenville salary plans because that's the only years they came up with for sales mix for us was 94 through -- I believe it was '94 through 2001.
Q. How was that average compiled?
A. It was compiled by taking the contributions in the government participation for the years '94 through 2001 for those two plans and just adding them together and taking

Q. To whom does the director of benefits finance report?
A. The controller.



Q. For Raytheon Company?
A. Yes.
Q. And to whom does the assistant controller --
A. Same.
Q. Are these coordinate positions or is one -- is an assistant controller a higher position than a director within the organization?
A. I think it was at one time; and when I took the position, that title hadn't changed because the organization had a larger responsibility at the time because restructuring was ongoing. Then restructuring Santa Feed down. They just didn't change the title.
Q. Could you tell me whether you made any efforts -- you or anyone else on Raytheon's behalf -- made any efforts to find out any of the information called for in paragraph 1 of schedule A of the notice of deposition relating to the Optical segment other than what is depicted on that summary page, namely the one number of 55,172,000 in pension costs for the year 1991?
A. We -- as a matter of fact, I contacted Optical systems and Optical systems provided us with some sales ratios to use for government participation; but since there

was only one year of pension costs that anyone came up with,
^ that's all we received and we had that-out we received
that internally.
Q. If you could focus, Mr. Murphy, on column A at
this point?
A. Yes.
Q. There's a single figure there depicted for a
single year?
A. Correct.
Q. Reply question is was there -- I mean, obviously
if there were no pension costs, there were no pension costs
for that year allocated to any final cost objective?
A. Correct.
Q. For that one single year of 1991, did you or
anyone else at Raytheon attempt to find out how that pension
cost was allocated among the various final cost objectives
of the Optical segment?
A. No.
Q. Why was that?
A. Because we felt that using sales proportionately
for these costs was a reasonable approach.
Q. And why was that? For the reasons that you

97

stated previously?
A. Correct.
Q. Is there anything particular or unique about the
Optical segment that would make a more compelling case for
the use of sales as a proxy for actual pension cost

supplement, or revise at this point in time?

A. Let me answer that this way. As of the moment, no. I think with the amount of time we spent, I would read through in and if there is something, I will legislate you know. As of the current time, nothing comes to mind I would



need to change.

Q. That was my question.

A. I do want to make one clarification. When you talked about the term "basis," I am addressing primarily in here the government participation and not the underlying claim relative to the deficits.

Q. I'm not sure what distinction you are drawing?

A. I am focusing on -- most of the discussion we have had is on government participation in these deficits. These deficit amounts were put together by Mercer, and the government from what I know, from what I remember any way looking at some of the audit reports hasn't taken any issue with the deficits.

BY MR. BIRD:

Q. We are going to cover the calculation of the deficits?

A. That's fine.

Q. Perhaps that's a clarification you can come back to at that point.

I would like to turn to paragraph 3 of schedule A which is on page 3. That paragraph 3 requires Raytheon to

each segment, and the basis -- and basis is initial capped -- therefore, including, without limitation all actuarial and other assumptions used and the basis -- again initial cap -- for such assumptions, period, close quote.

Do you see paragraph 5? The schedule A of the notice of deposition, Mr. Murphy?

A. Yes.

Q. I'm going to ask you some questions about that. I'd like to start with, again, the Aerospace segment. Start with that and if you could -- you might want to have in front of you Exhibit 2.

I'm looking at the first attachment to Defendant's Exhibit No. 2 for identification with respect to Aerospace, and I'd like you to focus on the row or line marked -- that's -- that page is the page entitled calculation of the government's share of the adjustment resulting from the Raytheon Aerospace segment closing and the next line says summary, close quote.

If you look at line D, surplus/(deficit), there are two plans listed, salaried plan and base plan. We looked at those previously. The total for the Aerospace --



excuse me -- the total for the Aerospace segment is a deficit amount of 6,092,135.

Do you see that?

A. Yes.

Q. Can you tell me how that deficit amount was arrived at for the amounts that total up to 6,092,135? How was that arrived at?

A. That was arrived at by Mercer, our outside actuarial firm. They provided those numbers to us. I cannot explain to you how they calculated the numbers.

Q. Is there anyone at Raytheon who could explain how they calculated the numbers?

A. Possibly.

Q. Are you aware of anyone?

A. Well, the -- I don't know to be honest with you. Some of these were put together a while back. The person that's in the position now may not have been in the position when some of these were calculated. I'm not sure.

Q. The person in the position is Mr. Cann?

A. No. The person in the position is Deb Tully who does pension benefits for Raytheon.

Q. Who was her predecessor? Was it Michael Garvey?



A. Yes, it was.

Q. Did you understand, Mr. Murphy, that the notice of the deposition required Raytheon to produce at today's deposition someone who could explain how the -- among other things, the amount of the deficit was calculated for each of the segments?

A. I'm not sure that I went through that in that detail. I did read through this.

Q. Regardless of what the notice may have required, though, I take it you're not the position to is going to provide that explanation?

A. No, sir.

MS. MANOS: I'm going to state on the record

Mr. Murphy is the person who is going to provide that explanation to the extent there is one provided. Raytheon's position is they relied on Mercer. No one at Mercer calculated these numbers. No one is going to explain to you how Mercer did it except when you depose someone at Mercer.

BY MR. BIRD:

Q. Do you know whether Raytheon -- or whether Mercer is still the actuary for Raytheon?

A. Yes, they are.



Q. And has Mercer been the actuary for Raytheon throughout the period from at least the year 2000 to date?

A. Yes.

Q. Let me just make sure I understand before we go on. So is it true that you're not prepared to tell me anything about how the amount of the pension assets that were allocated to the Aerospace segment or any other segment was determine for purposes of Raytheon's segment closing calculation; is that true?

A. The question is am I going to explain that?
No, I'm not.

Q. Okay. And --

A. Other than Mercer. Mercer put all that together.

Q. Would your answer be the same with respect to the question of how the amount of the actuarial liability for any of the segments was determined as of the date of the segment closing for purposes of the CAS 413 segment closing calculation?

A. All of the liabilities were put together by Mercer also.

Q. And you're not in a position to describe



anything about how they arrived at those numbers; is that true?

A. That is correct.

I will say this, though. DCAA did audit all of those calculations and I don't believe there's any issues that were raised in the determination of those deficit amounts. As I recall.

Q. My question, sir, related to the notice of deposition and the basis for the calculations. I don't know whether DCAA had subpoena power.

MR. BIRD: Let me mark another exhibit. I'd like to have the reporter mark as Defendant's Exhibit No. 6 for identification a letter dated June 19, 2002, from Mr. Garvey to Mr. John McGrath which contains -- it is a one-page letter which contains as its sole attachment a letter dated June 13, 2002 from Mr. Jonathan R. Barry, F.S.A.E.A. on the letterhead of Mercer Human Resource Consulting and an address in Boston, Massachusetts.

(A document was marked for identification as Exhibit Murphy No. 6.)

BY MR. BIRD:

Q. When you have had a chance to review Defendant's Exhibit No. 6 for identification, could you tell me whether you recognize the document?

A. Yes, I do.

Q. Are you able to identify it for the record as a true and complete copy of a letter Mr. Garvey sent to Mr. McGrath on or about June 19, 2002?

A. I'm not quite sure how one says that. These aren't page numbered. I assume it is, with all the pages here.

Q. You're not aware of any problems with the exhibit, that it's incomplete?

A. I'm not aware of any, no.

Q. As you point out, the pages are not numbered, but if you look at the fourth page of this exhibit, it is the first attachment to the Mercer letter that's attached to Mr. McGrath's letter to Mr. McGrath has a spreadsheet dated at the bottom 6-12-2002 at 6:25 p.m. and has the title Raytheon Aircraft Company Bobcat divestiture -- CAS 415 settlement analysis.

Do you see that?

A. Yes, I do.



Q. If you can have also close by, Mr. Murphy, the Aerospace claim which we marked as Defendant's Exhibit No. 2 for identification?

A. Yes.

Q. You will notice on that same page of Exhibit 2

there is some information regarding -- in the second full paragraph, the paragraph that begins the closing of the AIS of affected participants in several legacy plans.

Do you see that paragraph?

A. Yes, I do.

Q. Do you know whether that information is correct?

A. I have no reason to believe that it isn't.

Q. But you have no basis to say that it is; is that correct?

A. I'm sure it was provided by -- the information was provided by Mercer.

Q. How would Mercer know whether the closing of the AIS segment affected participants in legacy plans? Isn't that something Raytheon would tell Mercer?

A. Between the two of them, they would track the people and determine what plans they were in.

Q. Let's move on to the Optical segment. That would be Defendant's Exhibit 4 for identification.

I think I already asked you this, but memory is failing me. If you'd turn back to the last page of Exhibit 3 --

A. Yes.



Q. I'm looking at the surplus deficit figure of the deficit of 13,904,980?

A. What page?

Q. This one (indicating.) I switched exhibits on you. I went back to AIS?

A. I'm sorry. You're not in Optical.

Q. No.

A. All right.

Yes.

Q. I believe I asked you this, but I'm not sure. Is it the case that you're not able to give me any information at all about how that value of a deficit of 13,904,980 was derived by Mercer?

A. Correct. I cannot explain Mercer's calculations.

Q. You don't know what assumptions they used, what calculations they did , anything of that sort?

A. No, sir.

Q. If you could now turn to Exhibit 4 for identification?

Now, we're on the Optical segment. For simple is tee, let's go to the last page.



On the last page, there is a chart similar to the last page of Defendant's Exhibit 3; and under the heading for the page is "Calculation of the government's share of the PRB adjustment resulting from the Raytheon Optical business closing."

Do you see that page, sir?

A. Yes.

Q. The second row has the title surplus/(deficit) and has a value indicated of a negative 4,700,911.

Do you see that?

A. Yes, I do.

A. That is correct.

MR. BIRD: If you give me a minute, I'd like to consult.

(Recess.)

MR. BIRD: At this point, I have no further questions. I tender the witness.

MS. MANOS: I just want to ask a couple of questions so we'll be clear why Mr. Murphy was selected as the designated person.

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MS. MANOS:

Q. Mr. Murphy for each of the segment closing calculation for the pension and PRB part you referred throughout today's testimony to the analysis done by Mercer.

Can you explain what you did with the analysis



prepared by Mercer and how it formed or how it went into the claims?

A. Mercer is our outside actuary. In essence, we took ^ check question ^ the information from Mercer. When Mercer provided the information to Raytheon, it was also provided to DCAA, and I believe the CIPA team looked at some of those documents that were /( put together by Mercer.

They reviewed those because if you look at all of the documentation that was provided, the initial submissions for threes four claims did not contain any government participation. They only contained the Mercer package.

Subsequent to that. as when we worked with

government participation. So those were looked at first. I don't believe there's anything in the documentation that took any issue with the calculations associated with the -- you know, the determination of the asset and liability position at the time of the segment closing. So we look those amounts, those deficit amounts and utilized them in the claims and then extended them further as we researched further information to determine government participation.

That's what we did with them.



Q. Mr. Murphy, do you know who if there was any direct communication between the CIPA team and Mercer?

MR. BIRD: Objection to the form. You may answer.

THE WITNESS: I believe there was. Mercer would confer on occasion with George Matray down in New York.

BY MS. MANOS:

Q. Do you know who George Matray is?

A. George Matray works in the insurance group for DCMA, I believe.

Q. Is that the same process that was followed for the segment closings where there was a surplus?

A. Yes, it was.

MR. BIRD: Objection. Beyond the scope of the direct examination.

THE WITNESS: Yes, it was.

MS. MANOS: Thanks. I have no further questions.

MR. BIRD: Mr. Murphy under the rules of court

I'm entitled to ask you some cross-examination questions or redirect I guess it is technically called at this point.

EXAMINATION BY COUNSEL FOR DEFENDANT



BY MR. BIRD:

Q. When you described the process by which you employed the information provided by Mercer in response to counsel's questions right now, was the decision that -- strike that --

Did you understand that a description of that process, namely relying upon what Mercer had provided, would comply with the notice of deposition?

A. I'm not sure I follow the question.

Q. The trouble I'm having is that the notice of deposition calls for a Raytheon representative to testify about certain matters, and there are numerous matters upon which you have not been able to testify to because you have said Mercer did that, and you don't know how they did it or what they arrived at.

So what I'm getting at is who made the decision not to provide the information called for in the notice? That wasn't a decision you made, was it?

A. I guess I'm not --

Q. Information about how Mercer derived the numbers that are in Raytheon's claim?

A. I don't know.

Q. Is that a decision made by Raytheon?
A. I presume so.
Q. And I think I asked you this previously, but if not, let me make sure: As part of the preparation for the deposition, you did not make any efforts to contact Mercer to find out the basis for any of their calculations; is that true?
A. I did not.
Q. And as far as you know, no one from Raytheon did; is that true?
A. That I can't speak to. I do not know that.
Q. But -- well, as you sit here today, you have no knowledge or information that anyone from Raytheon did make such an effort to contact Mercer; is that true?
A. That is true.
Q. The telephone conversation or the conversations that you described that Mercer -- you believe Mercer had with Mr. Matray, were you a part to either of those conversations?
A. No.
Q. Your knowledge is based entirely about what somebody else told but those conversations?



A. That is correct.
Q. Who is it who told you about those conversations?
A. Let me back a ways. Probably Mike Garvey.
Q. Anyone else?

A. Not that I can recall.

MR. BIRD: I have no further questions on redirect.

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MS. MANOS:

Q. My last is just the instruction that the witness -- under the rules you are entitled to review a copy of your transcript and make whatever changes in form or substance you feel appropriate to make sure the testimony recorded accurately reflects what your testimony has been.

Do you elect to have that right?

A. Yes.

MS. MANOS: Okay.

MR. BIRD: For the record, the deposition -- the government's position is that the deposition has not been completed. We are finished for the day. We've gone as far as we can. But the government reserves the right to ask the



court to compel Raytheon to provide a witness for additional depositions regarding the numerous subject matters as to which this designated representative had no knowledge or information to supply in response to the notice.

MS. MANOS: Our position is that those questions go to expert testimony, and the court has directed us to provide expert reports; and we will provide them with the actuarial assumptions and calculation of the pension deficit, and you can depose the expert witness.

MR. BIRD: Again, that is an objection that we're hearing for the first time at approximately 5 of 3:00

on the day of the deposition, and it is untimely.

But I know you disagree with that. I think we're done for today.

THE WITNESS: Okay.

MR. BIRD: Thank you for your time.

(Whereupon, at 3:54 p.m., the taking of the instant deposition ceased.)

______________________________

Signature of the Witness



SUBSCRIBED AND SWORN to before me this _______ day of _______________, 20_____.

______________________________

Notary Public

My Commission Expires:________________