IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------X

RAYTHEON CORPORATION, :

Plaintiff, :

v. : No. 05-448C

UNITED STATES OF AMERICA, :

Defendant. :

---------------------------------X

Washington, D.C.

Thursday, December 14, 2006

Deposition of TERENCE MURPHY, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by DENNIS A. DINKEL, a Notary Public in and for the District of Columbia, taken at the offices of the U.S. Department of Justice, 1100 L Street, N.W., Washington, D.C. at 9:01 a.m., Thursday, December 14, 2006, and the proceedings being taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed under his direction.

Page 146

of Raytheon ever submitted a CAS disclosure statement for the PWF segment?
A. It was my understanding that PWF had a disclosure statement when it was part of DSS, but I have not seen it.
Q. What's your understanding based on?
A. Conversation.
Q. Somebody told you this?
A. Yes.
Q. Do you know why the decision was made to have a disclosure statement for the PWF unit?
A. No.
Q. I'd like to move on to another paragraph, but I'd like to take -- go to paragraph 5, rather than paragraph 4, and go out of turn. Paragraph 5 calls upon Raytheon to provide a witness who will testify in response to questions at today's deposition regarding, "The amounts, values, and calculations contained in the claims for the CAS 413 segment-closing adjustment, including the claims for PRB liability that plaintiff submitted to the government with respect to each segment, and the

Page 147

Basis" -- and basis is initial capped -- "therefore, including, without limitation, all actuarial and other assumptions used and the Basis" -- again, initial cap -- "for such assumptions."
Do you see paragraph 5? The schedule A of the notice of deposition, Mr. Murphy?
A. Yes.
Q. I'm going to ask you some questions about that. I'd like to start with, again, the Aerospace segment. Start with that and if you could -- you might want to have in front of you Exhibit 2.
I'm looking at the first attachment to Defendant's Exhibit No. 2 for identification with respect to Aerospace, and I'd like you to focus on the row or line marked -- that's -- that page is the page entitled "Calculation of the Government's Share of the Adjustment Resulting From the Raytheon Aerospace Segment Closing" and the next line says "summary."
If you look at line D, surplus/(deficit), there are two plans listed, salaried plan and base plan. We looked at those previously. The total for

Page 148

the Aerospace -- excuse me -- the total for the Aerospace segment is a deficit amount of 6,092,135.
Do you see that?
A. Yes.
Q. Can you tell me how that deficit amount was arrived at for the amounts that total up to 6,092,135? How was that arrived at?
A. That was arrived at by Mercer, our outside actuarial firm. They provided those numbers to us. I cannot explain to you how they calculated the numbers.
Q. Is there anyone at Raytheon who could explain how they calculated the numbers?
A. Possibly.
Q. Are you aware of anyone?
A. Well, the -- I don't know, to be honest with you. Some of these were put together a while back. The person that's in the position now may not have been in the position when some of these were calculated. I'm not sure.
Q. The person in the position is Mr. Cann?
A. No. The person in the position is Deb

Page 149

Tully, who does pension benefits for Raytheon.
Q. Who was her predecessor? Was it Michael Garvey?
A. Yes, it was.
Q. Did you understand, Mr. Murphy, that the notice of the deposition required Raytheon to produce at today's deposition someone who could explain how the -- among other things, the amount of the deficit was calculated for each of the segments?
A. I'm not sure that I went through that in that detail. I did read through this.
Q. Regardless of what the notice may have required, though, I take it you're not the person who is going to provide that explanation?
A. No, sir.
MS. MANOS: I'm going to state on the record, Mr. Murphy is the person who is going to provide that explanation to the extent there is one provided. Raytheon's position is they relied on Mercer. Mercer calculated these numbers. No one is going to explain to you how Mercer did it except when you depose someone at Mercer.

Page 150

BY MR. BIRD:
Q. Do you know whether Raytheon -- or whether Mercer is still the actuary for Raytheon?
A. Yes, they are.
Q. And has Mercer been the actuary for Raytheon throughout the period from at least the year 2000 to date?
A. Yes.
Q. Let me just make sure I understand, before we go on. So is it true that you're not prepared to tell me anything about how the amount of the pension assets that were allocated to the Aerospace segment or any other segment was determined for purposes of Raytheon's segment-closing calculation; is that true?
A. The question is, am I going to explain that? No, I'm not.
Q. Okay. And --
A. Other than Mercer. Mercer put all that together.
Q. Would your answer be the same with respect to the question of how the amount of the actuarial liability for any of the segments was determined as

Page 151

of the date of the segment-closing for purposes of the CAS 413 segment-closing calculation?
A. All of the liabilities were put together by Mercer also.
Q. And you're not in a position to describe anything about how they arrived at those numbers; is that true?
A. That is correct. I will say this, though. DCAA did audit all of those calculations, and I don't believe there's any issues that were raised in the determination of those deficit amounts. As I recall.
Q. My question, sir, related to the notice of deposition and the basis for the calculations. I don't know whether DCAA had subpoena power.
MR. BIRD: Let me mark another exhibit. I'd like to have the reporter mark as Defendant's Exhibit No. 6 for identification, a letter dated June 19, 2002, from Mr. Garvey to Mr. John McGrath, which contains -- it is a one-page letter which contains as its sole attachment a letter dated June 13, 2002 from Mr. Jonathan R. Barry, F.S.A.E.A. on the letterhead of Mercer Human Resource Consulting, and an address

Page 152

in Boston, Massachusetts.
(A document was marked for identification as Exhibit Murphy No. 6.)
BY MR. BIRD:
Q. When you have had a chance to review Defendant's Exhibit No. 6 for identification, could you tell me whether you recognize the document?
A. Yes, I do.
Q. Are you able to identify it for the record as a true and complete copy of a letter Mr. Garvey sent to Mr. McGrath on or about June 19, 2002?
A. I'm not quite sure how one says that. These aren't page numbered. I assume it is, with all the pages here.
Q. You're not aware of any problems with the exhibit, that it's incomplete?
A. I'm not aware of any, no.
Q. As you point out, the pages are not numbered, but if you look at the fourth page of this exhibit, it is the first attachment to the Mercer letter that's attached to the letter to Mr. McGrath

Page 153

that has a spreadsheet dated at the bottom 6-12-2002 at 6:25 p.m. and has the title Raytheon Aircraft Company Bobcat divestiture - CAS 415 settlement analysis.
Do you see that?
A. Yes, I do.
Q. If you can have also close by, Mr. Murphy, the Aerospace claim which we marked as Defendant's Exhibit No. 2 for identification?
A. Yes.
Q. You will notice on that same page of Exhibit 2 we were looking at before that had the value for the deficit of 6,092,135, then take a look at the page that has the Bobcat divestiture heading I referred you to?
A. Yes.
Q. You see in the lower right hand corner in line -- row Q, there is a CAS settlement, it is called, of 6,092,135.
A. Yes. I see that.
Q. Is that your understanding of Mercer's calculation of the deficit of the Aerospace segment

Page 190

Q. I'd like you to turn to the previous page, attachment 1?
A. Yes.
Q. This contains data on the allocation of government participation by contract type over the years from 1974 through 2001. And it has a column for cost and flexible, a subtotal, and then a column headed FFP, and then a total, and the total is always a hundred.
Do you see that?
A. Yes.
Q. Do you understand that FFP refers to firm fixed price?
A. Yes.
Q. Do you have any reason to -- well, let me ask this. Did Raytheon rely on any of the data on attachment 1 to Defendant's Exhibit 7 for identification in the preparation of its claim?
A. No.
Q. Do you have any reason to disagree or dispute any of the values contained on attachment 1?
A. No. But attachment 1 only represents

Page 191

government sales. It is not total sales. This is a breakdown of contract type within only government sales. It is not percentages of government sales to total sales.
Q. So if you wanted to know the total breakdown of pension cost for all the final cost objectives for any particular year for the Greenville operation, in addition to the data on attachment 1, you need a third -- or an additional column that said non-government percent?
A. Which means these percentages would go down. There'd be another component to get to a hundred. This is only a piece of the puzzle.
Q. We skipped over this previously, Mr. Murphy, but I'd like to go back to paragraph 4 of schedule A of the notice of deposition.
That's the only paragraph we haven't talked about yet in the deposition. That paragraph -- that is on page 3 of schedule A.
That paragraph says, "a. the amount of liability for PRBs that plaintiff contends should be included in the CAS 413.50(c)(12) segment-closing

Page 192

calculation for each segment; and
"b. the calculation of any such amount and the Basis for such calculation, including, without limitation, all actuarial and other assumptions used, and the Basis for such assumptions."
Do you see that in schedule A?
A. Yes, I do.
Q. Can you tell me anything about -- let's focus on paragraph -- subparagraph (b) for the moment. Can you tell me anything about the calculation of any amount of PRBs that plaintiff contends should be included in the CAS 413 segment-closing calculation for any of the four segments?
A. I cannot. Mercer prepared that information.
Q. By that I mean would you similarly be unable to say anything about what actuarial or other assumptions Mercer used?
A. That is correct.
Q. As far as responding to paragraph 4(a), I take it you are able to tell me by reference to the

Page 193

claims, the amount of liability for PRBs that plaintiff contends should be included in the CAS 413 segment-closing calculation for AIS, Optical, and PWF, right?
A. Based upon Mercer's information, yes.
Q. You can tell me the amount, but you can't tell me anything about how that amount was derived; is that correct?
A. That is correct.
MR. BIRD: If you give me a minute, I'd like to consult.
(Recess.)
MR. BIRD: At this point, I have no further questions. I tender the witness.
MS. MANOS: I just want to ask a couple of questions, so we'll be clear why Mr. Murphy was selected as the designated person.
EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MS. MANOS:
Q. Mr. Murphy, for each of the segment-closing calculations for the pension and PRB part, you referred throughout today's testimony to