# In the United States Court of Federal Claims

**No. 05-448C**
**(Filed: April 29, 2010)**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **RAYTHEON COMPANY,** | * | **Partial Summary Judgment; Post-** |
| | * | **Retirement Benefits; Segment Closing** |
| **Plaintiff,** | * | **Adjustment; Cost Accounting** |
| | * | **Standards; CAS 403, 48 C.F.R. §** |
| **v.** | * | **9904.403; CAS 412,  48 C.F.R. §** |
| | * | **9904.412; CAS 413, 48 C.F.R. §** |
| **THE UNITED STATES,** | * | **9904.413; FAR 205-6(o), 48 C.F.R. §** |
| | * | **31.205-6(o).** |
| **Defendant.** | * | |
| | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * | * | |

*Karen L. Manos*, Washington, DC, for plaintiff.  *Christyne K. Brennan*, Washington, DC, of counsel.

*C. Coleman Bird*, Washington, DC, with whom were *Assistant Attorney General Tony West*, and Director Jeanne E. Davidson, for defendant.  *Lawrence S. Rabyne*, Defense Contract Management Agency, Arlington Heights, IL, of counsel.

*Richard D. Bernstein*, Washington, DC, for *amicus curiae* General Electric Company. *Howard Stanislawski*, Washington, DC and *Alan C. Brown*, McLean, VA, of counsel.

## O P I N I O N

**FIRESTONE,** *Judge.*

Pending before the court are the parties' cross-motions for partial summary

judgment under Rule 56 of the Rules of the United States Court of Federal Claims

("RCFC").  At issue is whether Raytheon's post-retirement benefit ("PRB")[1] costs are

"pension costs" within the meaning of Cost Accounting Standard ("CAS") 412.40(a), 48

C.F.R. § 9904.412-40(a) (2010).[2]  Raytheon argues that if PRB costs are pension costs,

---

[1]PRBs are not defined in the CAS.  However, the term "post-retirement benefit" is defined in the Federal Acquisition Regulations ("FAR") as follows:

> PRB covers all benefits, other than cash benefits and life insurance benefits paid by pension plans, provided to employees, their beneficiaries, and covered dependents during the period following the employees' retirement. Benefits encompassed include, but are not limited to, post[-]retirement health care; life insurance provided outside a pension plan; and other welfare benefits such as tuition assistance, day care, legal services, and housing subsidies provided after retirement.

FAR 31.205-6(o)(1), 48 C.F.R. § 31.205-6(o)(1) (2010).

[2]CAS 412.40(a) states:

> (a) Components of pension cost.
>
> (1)  For defined-benefit pension plans, except for plans accounted for under the pay-as-you-go cost method, the components of pension cost for a cost accounting period are (i) the normal cost of the period, (ii) a part of any unfunded actuarial liability, (iii) an interest equivalent on the unamortized portion of any unfunded actuarial liability, and (iv) an adjustment for any actuarial gains and losses.
>
> (2)  For defined-contribution pension plans, the pension cost for a cost accounting period is the net contribution required to be made for that period, after taking into account dividends and other credits, where applicable.
>
> (3)  For defined-benefit pension plans accounted for under the pay-as-you-go cost method, the components of pension cost for a cost accounting period are:
>
> (i) The net amount of periodic benefits paid for that period, and
>
> (ii) An amortization installment, including an interest equivalent on the unamortized settlement amount, attributable to amounts paid to irrevocably settle an obligation for periodic benefits due in current and future cost accounting periods.

CAS 412.40(a), 48 C.F.R. § 9904.412-40(a).  The segment closings in this case all took place

they must be included in three segment closing adjustments required under CAS 413, CAS 413.50(c)(12), 48 C.F.R. § 9904.413-50(c)(12) (1995) ("CAS 413").[3]  For the reasons that follow, the court finds that Raytheon's PRB costs are not "pension costs" and cannot be included in the segment closing adjustments at issue in this case.

## BACKGROUND FACTS

The following facts are not in dispute unless otherwise noted.[4]  This case arises

---

after the CAS was amended in 1995.  Therefore, references are made to the revised CAS unless otherwise specified.

[3]For a description of the segment closing provision, see n.6 infra.  See also Teledyne, Inc. v. United States, 50 Fed. Cl. 155 (2001) aff'd sub nom. Allegheny Teledyne Inc. v. United States, 316 F.3d 1366 (Fed. Cir. 2003), cert. denied sub nom. Gen. Motors Corp. v. United States, 540 U.S. 1068 (2003).

[4]Raytheon presented facts asserting that all of the PRB plans were offered under the same terms and to the same beneficiaries as its basic pension plans.  According to Raytheon, the PRB plans were offered in a unified communication to employees, using the same eligibility criteria, with the same benefit commencement date and the same coverage for beneficiaries, based on the same actuarial assumptions.  In support of the majority of these facts, Raytheon submitted the unsworn report of its expert, Steven Vernon, as well as several unauthenticated documents.

While the government does not indicate that it disagrees with the substance of many of Raytheon's factual claims, including several regarding the similarities between the pension and PRB plans, it disputes many of Raytheon's proposed facts on the ground that they were not supported by affidavit or by other admissible evidence in accordance with Rule 56(e) RCFC or by an original document.  See, e.g., Def.'s Resp. to PPFUF 8 ("Defendant disputes PPFUF No. 12 pursuant to RCFC 56(e)[,] as Mr. Vernon's unsworn report does not demonstrate personal knowledge to competently testify to the facts alleged, and pursuant to Rule 1002 of the Federal Rules of Evidence, which states that the original of a writing is required to prove the contents of a writing unless certain stated exceptions apply, and none of these exceptions apply in this instance.").  The government therefore argues that Raytheon has not presented admissible facts to support its summary judgment claim.  See Haywood v. Lucent Techs., Inc., 323 F.3d 524, 533 (7th Cir. 2003) (stating that "[e]vidence relied upon [to defeat a motion for summary judgment] must be competent evidence of a type admissible at trial;" 10A Charles Alan Wright et al., Federal Practice & Procedure § 2722, at 379-80 & 382-84 (3d ed. 2009) ("Rule 56(e) requires that sworn or certified copies of all papers referred to in an affidavit must be attached to or served with that affidavit. . . . To be admissible, documents must be authenticated  by and

from the sales of three Raytheon segments: (1) Aircraft Integrated Systems ("AIS"); (2)

Optical Systems ("Optical") and (3) Printed Wire Fabrication ("PWF").[5]  All of the sales

occurred after the 1995 revisions to CAS 413-50(c)(12) and gave rise to a CAS 413

segment closing adjustment for each segment's basic pension plans.[6]  At issue are the

costs associated with multiple PRB plans, which provided health and other benefits to

---

attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.").

The court agrees with the government that Raytheon failed to properly support many of the facts regarding the details of its pension and PRB plans.  Therefore, the court will not, at this stage, consider the facts objected to by the defendant and limits itself, for purposes of its decision on summary judgment, to only those facts with which the defendant has indicated agreement.  However, the court also finds that, in any case, none of the unsupported facts relied upon by Raytheon create a genuine issue of material fact.  Thus, the court is not precluded from resolving the legal issues presented by the cross-motions for partial summary judgment.

[5]While the parties also discussed a fourth segment in their briefs, counsel for Raytheon stated, at oral argument, that there are no PRB claims related to this segment.

[6]In Allegheny Teledyne, the Federal Circuit explained the basic concepts for determining pension costs and for conducting segment closing calculations as follows:

> CAS 412 governs how a contractor determines its pension costs for each period – by the contractor's best actuarial estimate of the plan's anticipated earnings and benefit payments, taking into account the plan's past experience and reasonable expectations. . . . [CAS 413] provides for two related types of adjustments to a contractor's pension costs: (1) adjustments to account for the pension plan's actuarial gains and losses and (2) adjustments to account for a closed segment's pension surplus or deficit.  Under normal circumstances, the actuarial gains or losses (differences between the estimates and actual experience) are amortized in equal annual installments over a fifteen-year period.  This is not the case, however, when a "segment closing" occurs. . . . In the event a contractor closes a segment, . . . CAS 413 provides that a contractor . . . shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment . . . . The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs.

Allegheny Teledyne, 316 F.3d at 1371 (citations and internal quotation marks omitted).

employees at the three segments.

## I.       The AIS Segment

The AIS segment was part of Raytheon before Raytheon sold it to L-3

Communications Corporation on March 8, 2002.  The sale resulted in a segment closing

and thus triggered a CAS 413 segment closing adjustment.

The chart set forth below identifies relevant pension and PRB plans of Raytheon's

retirement program for AIS employees.[7]  For purposes of this decision, the terms "PRB

plan" and "employee welfare benefit plan" (the term used in the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461, § 1002(1) (2008)),[8] will be

used interchangeably.

| Employee Group | Pension Plan | PRB Plan |
|---|---|---|
| Salaried Employees of E-Systems | E-Systems, Inc. Salaried Employees Retirement Plan | Raytheon E-Systems, Inc. Medical Welfare Benefits Plan (E-Systems, Inc. Salaried Plan component) |

---

[7]The government disputes that the chart includes all of the relevant pension and PRB plans for AIS, but has not provided evidence of any other plans.  Moreover, Raytheon is only seeking PRB costs for the above-identified plans.

[8]As discussed infra, ERISA distinguishes between employee pension plans and employee welfare benefit plans.  One of the major differences between the two plans is that an employee pension plan provides a vested lifetime benefit, whereas employee welfare benefit plans may be modified or terminated by an employer at any time for any reason.  See Curtiss-Wright Corp. v. United States, 514 U.S. 73, 78 (1995) ("Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans.  Nor does ERISA establish any minimum participation, vesting, or funding requirements for welfare plans as it does for pension plans." (citation omitted)).

| Hourly Employees of E-Systems | Retirement Plan for Hourly Employees of E-Systems | Raytheon E-Systems, Inc. Medical Welfare Benefits Plan (Greenville Hourly component) |
|---|---|---|
| Employees at Richardson | Raytheon E-Systems, Inc. Richardson/Waco Retirement Plan | Raytheon E-Systems, Inc. Medical Welfare Benefits Plan (Richardson location) |
| Employees at Raytheon TI Systems ("RTIS") | RTIS Employees Pension Plan | RTIS Employee Welfare Benefit Plan |

In contrast to the basic pension plans, however, Raytheon reserved the right to modify or terminate the PRB Plans listed above at any time and at for any reason.

Funding for some but not all of three of the aforementioned PRB plans was established through an Internal Revenue Code ("I.R.C.") § 401(h) ("Section 401(h)") trust account ("401(h) account" or "401(h) plan"). See 26 U.S.C. § 401(h) (2006).[9]

Because contributions to 401(h) accounts are limited to 25% of the employer's pension contributions, Raytheon also established a Voluntary Employees' Beneficiary Association trust account ("VEBA") under I.R.C. § 501(c)(9), 26 U.S.C. § 501(c)(9)

---

[9]A 401(h) account is a tax-exempt trust that is established as part of an ERISA qualified pension plan. See generally Terry A.M. Mumford and Mary Beth Braitman, Legal Considerations Regarding Funding Structures for Health Care and GASB Reporting, SP021 ALI-ABA 489 (2008). Section 401(h) allows a business to allocate as much as 25% of its normal pension contributions to funding for post-retirement health care costs in conjunction with an employer's pension plan. Section 401(h)(1). Because contributions to 401(h) plans are limited to 25% of the employer's pension contributions, 401(h) accounts may not, by themselves, be sufficient to fund all of the employer's promised post-retirement health care costs.

(2006), to fund PRBs.[10]  An employer-funded VEBA is another tax vehicle for funding

health or medical costs.  Id.

## II.    The Optical Segment

Raytheon's sale of Optical to the B.F. Goodrich Company resulted in a segment

closing.

Relevant pension and PRB plans of Raytheon's retirement program for Optical

employees are identified below:

| Employee Group | Pension Plan | PRB Plan |
|---|---|---|
| Employees of Optical Systems | Raytheon Nonbargaining Retirement Plan | Raytheon Medical Benefits Plan for Qualified Retirees |

In contrast to the basic pension plan, Raytheon reserved the right to modify or

terminate the Optical Systems PRB plan at any time for any reason.  The Optical PRB

plan was funded through VEBAs.

## III.    The PWF Segment

In April 2001, Raytheon sold PWF to Tyco Printed Circuit Group LP.  The sale

constituted a segment closing.

The following are the relevant pension and PRB plans of Raytheon's retirement

program for PWF employees:

---

[10]VEBAs are also referred to as "501(c)(9) Trusts."  See, e.g., I.R.S. Priv. Ltr. Rul. 9834037 (Aug. 21, 1998). It is a voluntary organization of employees usually established as a trust created by the employer to hold funds in trust to pay benefits to its members. See Mumford and Braitman, supra n.9 at 503.

| Employee Group | Pension Plan | PRB Plan |
|---|---|---|
| PWF employees at RTIS | Raytheon TI Systems, Inc. Employee Pension Plan (RTIS Pension Plan) | Raytheon TI Systems Employee Welfare Benefit Plan |

As with its other PRB plans Raytheon reserved the right to modify or terminate the PRB plan at any time and for any reason.

Funding for the Raytheon TI Systems Employee Welfare Benefit Plan was established through a 401(h) account in the corresponding pension plan. However, the PRB plan was not exclusively funded through a 401(h) account. As with AIS and Optical, VEBAs were also used.

## IV. Raytheon's Actions in Connection with Its Right to Terminate or Modify PRB Plans.

Raytheon has modified the above-described PRB plans in the past. For example, in 2004, Raytheon amended a number of its PRB plans in response to the 2003 amendments to Medicare that provided Medicare-participating retirees with prescription drug coverage (Medicare Part D).

## STANDARD OF REVIEW ON SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c)(1); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008); Telemac

Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1323 (Fed. Cir. 2001) (citation omitted).  In considering a motion for summary judgment, the court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Liberty Lobby, 477 U.S. at 249.  "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Lathan Co., Inc. v. United States, 20 Cl. Ct. 122, 125 (1990); Casitas Mun. Water Dist., 543 F.3d at 1283.  Cases involving only questions of law are particularly appropriate for summary judgment.  Dana Corp. v. United States, 174 F.3d 1344, 1347 (Fed. Cir. 1999).

## STANDARDS FOR INTERPRETING THE CAS

As the court noted in an earlier decision involving similar segment closing issues, "in evaluating the meaning of the original CAS 413.50(c)(12), the Federal Circuit has held that the court must be guided by the [CAS Board's ("CASB's")][11] intent in promulgating the standard."  GE II, 84 Fed. Cl. at 140 (citing Perry v. Martin Marietta Corp., 47 F.3d 1134, 1137 (Fed. Cir. 1995) ("[O]ur task in interpreting the meaning of these . . . provisions is ultimately to ascertain the CASB's intended meaning when it promulgated the CAS.")).  As the Federal Circuit explained in Allegheny Teledyne, 316 F.3d at 1373:

---

[11]The CASB is responsible for promulgating and revising the CAS.

> When interpreting provisions of the CAS our task is "to ascertain the [CASB's] intended meaning when it promulgated the CAS." <u>Perry v. Martin Marietta Corp.</u>, 47 F.3d 1134, 1137 (Fed. Cir. 1995). . . . We accomplish this by first looking at the text of the relevant provisions and "any guidance that the [CASB] has published to aid in interpretation." <u>Id.</u> at 1138.  We examine the issues . . . through this interpretive lens.

<u>See also</u> <u>Gates v. Raytheon Co.</u>, 584 F.3d 1062, 1067 (Fed. Cir. 2009) (quoting-in-part this passage from <u>Allegheny Teledyne</u> and reiterating that courts are to ascertain the CASB's intended meaning when it promulgated the CAS).

In addition, where the court is called upon to determine the proper relationship between application of the CAS and the FAR, the Federal Circuit has also provided guidance.  In <u>Boeing North American, Inc. v. Roche</u>, 298 F.3d 1274, 1283 (Fed. Cir. 2002), the Circuit explained that the CAS controls how costs are measured and allocated to government contracts.  However, the FAR is controlling on the issue of whether any specific cost will be allowed and paid.  <u>Id.</u> at 1284.

### REGULATORY HISTORY

The threshold issue in these motions is whether the costs attributable to the above-described Raytheon PRB plans should be included in the CAS 413 segment closing adjustments on the grounds that they qualify as pension costs within the meaning of CAS 413.  Resolving this issue requires a careful examination into the CAS rules that govern the composition, measurement and adjustment of pension costs under CAS 412 and CAS 413 and the various actions taken by the CASB and other government entities to deal with the accounting for and payment of PRB-related costs under government contracts.

The regulatory history of the government's actions with regard to the accounting for and payment of PRB costs is set forth below.

## I.     CAS 412 and CAS 413

It is not disputed that PRBs or, as they are called in ERISA, employee welfare benefits, are not specifically mentioned in either the original or amended CAS 412 and CAS 413.  However, both CAS 412 and CAS 413 were promulgated following the enactment of ERISA, which includes specific provisions on both basic pension plans and employee welfare benefit plans.

ERISA was enacted in 1974 to provide federal standards for the establishment and maintenance of employee pension plans.  See Nachman Corp. v. United States, 446 U.S. 359, 374-75 (1980) (discussing the legislative history of ERISA).  In brief, ERISA regulates two distinct types of employee benefit plans: employee welfare benefit plans

("welfare plans")[12] and employee pension benefit plans ("pension plans").[13]  See 29

U.S.C. § 1002(3) (2008).  Within the category of pension plans, ERISA recognizes two

---

[12]"Employee welfare benefit plan" is defined, for ERISA purposes, as follows:

> The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1).

[13]"Employee pension benefit plan" is defined, for ERISA purposes, as follows:

> Except as provided in subparagraph (B), the terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program--
>
> (i) provides retirement income to employees, or
>
> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.  A distribution from a plan, fund, or program shall not be treated as made in a form other than retirement income or as a distribution prior to termination of covered employment solely because such distribution is made to an employee who has attained age 62 and who is not separated from employment at the time of such distribution.

29 U.S.C. § 1002(2)(A) (2008).

basic types: defined-benefit[14] and defined-contribution[15] plans.

Classification of an employee plan as either a welfare plan or pension plan is significant because an employer is generally free to modify or terminate a <u>welfare plan</u> at any time and for any reason, but cannot modify or terminate a <u>pension plan</u> at any time for any reason.  Put another way, unlike welfare benefit plans, pension plans require funding and provide vested lifetime benefits to employees.  See <u>Curtis-Wright Corp.</u>, 514 U.S. at 78.

CAS 412, first promulgated in 1975, was designed "to provide guidance for determining and measuring the components of pension cost. . . . [and to] establish[ ] the basis on which pension costs shall be assigned to cost accounting periods."  CAS 412.20, 48 C.F.R. § 9904.412-20 (1993).  <u>See</u> 40 Fed. Reg. 43,873, 43,871 Pt. 412, pmbl. A (Sept. 24, 1975) (in which the CASB explains the relationship between ERISA and CAS 412); <u>see also</u> <u>GE II</u>, 84 Fed. Cl. at 571-72 (for a discussion on the history of CAS 412). It was intended to "enhance uniformity and consistency in accounting for pension costs and thereby increase the probability that those costs are properly allocated to cost objectives."  CAS 412.20, 48 C.F.R. § 9904.412-20.

---

[14]CAS 412.30(10), 48 C.F.R. § 9904.412-30(10) (2010), defines a defined benefit pension plan as "a pension plan in which the benefits to be paid or the basis for determining such benefits are established in advance and the contributions are intended to provide the stated benefits."

[15]CAS 412.30(11), 48 C.F.R. § 9904-30(11) (2010), defines a defined contribution pension plan as "a pension plan in which the contributions are established in advance and the benefits are determined thereby."

CAS 413 was promulgated in 1977 to provide further guidance to government contractors with regard to the assignment and adjustment of pension costs. In particular, CAS 413 provides guidance for adjusting pension costs by measuring actuarial gains and losses and assigning those gains and losses to cost accounting periods. CAS 413 also provides guidance for the allocation of pension costs to segments of organizations. Finally, CAS 413 provides rules for adjusting pension costs following a segment closing. 42 Fed. Reg. 37,191 (July 20, 1977).

Although the CAS 412 and CAS 413 were promulgated originally to address pension cost issues triggered by enactment of ERISA, the preambles to both rules make it clear that "ERISA does not contain the same definitions of "pension plan," as do CAS 412.30(a)(13) and CAS 413.30(a)(8). For CAS purposes, "pension plan" is defined as

> a deferred compensation plan established and maintained by one or more employers to provide systematically for the payment of benefits to plan participants after their retirement, provided that the benefits are paid for life or are payable for life at the option of the employees. Additional benefits such as permanent and total disability and death payments, and survivorship payments to beneficiaries of deceased employees may be an integral part of a pension plan.

CAS 412.30(a)(20), 48 C.F.R. § 9904.412-30(a)(20) (2010); CAS 413.30(a)(12), 48 C.F.R. § 9904.413-30(a)(12) (2010) (the definition is identical in both sections).

The reason the CASB included its own definition of "pension plan" in the CAS is explained in the preamble to the original version of CAS 412, which states, "The [CASB's] primary objective in developing definitions in this Standard . . . [is to] help

provide a clear understanding of the concept[s] used therein, while at the same time maintaining consistency with the thrust of the definitions used in . . . ERISA."  40 Fed. Reg. 43,873, 43,877.  With regard to the definition of "pension plan" specifically, the CASB stated,

> commentators requested elaboration of the definition of a pension plan. Specifically, they questioned whether the definition is applicable to execute [sic] compensation plans, excess benefit plans, and other plans that may not be qualified for Federal income tax [ERISA] purposes. . . . Several additional commentators questioned that portion of the definition of a pension plan which states that benefits shall be paid for life or payable for life at the option of the employee.  They questioned whether a life income settlement for an employee would fall within the meaning of the definition.  The [CASB] believes that such a settlement is, in effect, equivalent to a payment for life and thus falls within the intent of the definition.

Id.  Thus, the thrust of the CAS definition of "pension plan" is to include certain additional annuity plans that are guaranteed for life.

In addition to including a definition of "pension plan," CAS 412 also included a provision regarding "supplemental plans" in CAS 412.50(a)(9), which was also retained in the 1995 amendments as CAS 412.50(a)(7).  See 40 Fed. Reg. 43,873, 43,879 (the original version of CAS 412.50(a)(9)); 48 C.F.R. § 9904.412-50(a)(7) (2010) (the current version, containing an identical definition).  This section provides that

> [i]f a pension plan is supplemented by a separately-funded plan which provides retirement benefits to all of the participants in the basic plan, the two plans shall be considered as a single plan for purposes of this Standard.  If the effect of the combined plans is to provide defined[ ]benefits for the plan participants, the combined plans shall be treated as a defined-benefit plan for purposes of this Standard.

Id.

The import of supplemental plans is discussed in CAS 412.60(a), the illustrations section of the Standard.  See 40 Fed. Reg. 43,873, 43,889.  In CAS 412.60(a)(4), 48 C.F.R. § 9904.412-60(a)(4), the CASB included an illustration regarding "supplemental plans," which states:

> Contractor D provides pension benefits for certain employees through a defined-contribution pension plan.  However, the contractor has a separate fund which is used to supplement pension benefits provided for all of the participants in the basic plan in order to provide a minimum monthly retirement income to each participant.  Pursuant to [CAS] 412.50(a)(9), the two plans shall be considered as a single plan for purposes of this Standard. Because the effect of the supplemental fund is to provide defined[ ]benefits for the plan's participants, the provisions of this Standard relative to defined-benefit pension plans shall be applicable to the combined plan.

See also 40 Fed. Reg. 43,873, 43,880.  The concept identified in the illustration has been described as a "floor offset" plan.

Finally, although PRBs are not mentioned in CAS 412 or CAS 413, the concept of a PRB was mentioned in the Preamble to CAS 416, which regards the measurement of insurance costs.  In the 1978 Preamble to CAS 416, the CASB responded to a question regarding whether health insurance carried for a contractor's retired employees, "should be considered a form of deferred compensation [covered by CAS 415], a part of a pension plan [covered by CAS 412], or part of an insurance program [covered by CAS 416]."  43 Fed. Reg. 42,239, 42,241 Pt. 416, prefatory comment 10 (Sept. 20, 1978).  The CASB explained,

-16-

> The [CASB] believes that these standards provide ample criteria for determining which standard is applicable to any given cost.  In particular, the question of whether a benefit, such as insurance provided to retired persons, is an integral part of a pension plan and thereby governed by CAS . . . 412 or is a part of an insurance program and therefore governed by CAS 416 is a question of fact in each given instance.  Moreover, application of either standard to this element would result in substantially the same amounts of allocable costs.

Id. at 42,241-42.

## II.    FAS 106 and Proposed CAS 419

Although PRBs were not expressly addressed by the CASB when it originally promulgated the CAS in the 1970s or in the 1995 amendments, they became the topic of extensive CASB consideration in 1996, when the CASB issued a Staff Discussion Paper regarding the treatment of costs of post-retirement benefit plans other than pension plans under government contracts.  See 61 Fed. Reg. 49,533 (Sept. 20, 1996).[16]

---

[16]The CAS authorizing legislation, 41 U.S.C. § 422 (2006), establishes the following, four-step process for rulemaking:

> (1) Prior to the promulgation under this section of cost accounting standards and interpretations thereof, the Board shall--
>
> (A) take into account, after consultation and discussions with the Comptroller General and professional accounting organizations, contractors, and other interested parties--
> (i) the probable costs of implementation, including inflationary effects, if any, compared to the probable benefits;
> (ii) the advantages, disadvantages, and improvements anticipated in the pricing and administration of, and settlement of disputes concerning, contracts; and
> (iii) the scope of, and alternatives available to, the action proposed to be taken;
>
> (B) prepare and publish a report in the Federal Register on the issues reviewed under paragraph (1)(A);

In the background section of the Staff Discussion Paper, the CASB acknowledged that PRBs have existed for many years, but explained that they had not received much attention until the Financial Accounting Standards Board ("FASB") decided to require companies to report on the potential liabilities and costs of these plans. The FASB set standards for this in Statement No. 106 ("FAS 106"), which was issued in December 1990. See id. at 49,534.

Under FAS 106, companies are required to account for PRBs on an accrual basis regardless of whether they paid for PRBs on an accrual basis or pay-as-you go basis. The FASB explained the purpose of FAS 106 as follows:

> This statement represents the first authoritative accounting pronouncement that requires current recognition of the exchange transaction between an employer that promises to provide postretirement benefits and the employees who render service in exchange for the benefits promised. Employers have generally recognized the obligation and related costs arising from the exchange as the obligation was satisfied rather than when it was incurred. The Board concluded that the recognition required by this Statement should result in a more meaningful representation of the employer's financial position and results of operations at any point in time.

---

(C)(i) publish an advanced notice of proposed rulemaking in the Federal Register in order to solicit comments on the report prepared pursuant to subparagraph (B);
(ii) provide all parties affected a period of not less than 60 days after such publication to submit their views and comments; and
(iii) during this 60-day period, consult with the Comptroller General and consider any recommendation the Comptroller General may make; and

(D) publish a notice of such proposed rulemaking in the Federal Register and provide all parties affected a period of not less than 60 days after such publication to submit their views and comments.

41 U.S.C. § 422(g) (2006).

Financial Accounting Standards Board, FAS 106, Employers' Accounting for

Postretirement Benefits Other Than Pensions (Dec. 1990).  In other words, through FAS

106, the FASB required public companies to start to reflect the significant future costs of

PRBs in their financial statements in order for investors to better understand a company's

future pension-related liabilities.

The CASB Staff Paper explained that accounting under FAS 106 had revealed

substantial unfunded liabilities, stating,

> Companies adopting [FAS 106] have disclosed substantial unfunded estimated
> liabilities associated with post-retirement benefit plans.  The costs and
> liabilities of post-retirement benefit plans often not only equal or exceed those
> of a company's pension plan, but the growth rate of the liability for some post-
> retirement benefits exceeds that of general economic growth.

61 Fed. Reg. 49,533, 49,535.

The CASB identified three primary reasons for taking up the issue of PRBs.  First,

the CASB stated that "most Government contractors have now become subject to FAS

106 and are disclosing for financial reporting purposes large estimated liabilities for post-

retirement benefits."  Id. at 49,536.  Second, the CASB explained that "the procuring

agencies and contractors are already struggling with the sometimes[-]conflicting goals of

consistency between periods, uniformity between contractors, and the substantiation of

costs."[17]  Id.  Third, the CASB identified the issue of segment closings, stating, "as some

---

[17]The FAR was amended in 1991 to authorize reimbursement for PRBs under specified
circumstances.  See 56 Fed. Reg. 29,124, 29,128 (June 25, 1991).  This amendment resulted in
the addition of paragraph (o) to FAR 205-6, which is explained infra.

companies leave Government contracting. . . there is a question of the Government's

responsibility for the large unfunded estimated liability for post-retirement benefits

earned by workers." Id.

In its introduction to the topic, the CASB expressly discussed whether CAS 412

and CAS 413 presently (that is, as of 1996) covered the measurement and allocation of

PRBs.  Specifically, with regard to CAS 412 and CAS 413, the Staff Paper states,

> At first, many in the procurement community expressed a belief that post-
> retirement benefits were another form of pension benefits and were therefore
> subject to [CAS 412] and [CAS 413].  In response to an inquiry from the
> Financial Executives Institute, the Administrator of the Office of Federal
> Procurement Policy . . . and Chairman of the CASB, stated: "Existing CAS
> pension or insurance coverage does not appear to offer a basis for treating PRB
> costs.  In fact, the post-retirement benefit nomenclature barely existed at the
> time of the earlier [CASB]."  However, this statement represents guidance
> from the Administrator of OFPP and is not an official interpretation by the
> [CASB].

> The confusion increased as some individuals in the accounting profession
> expressed a belief that the [CASB] intentionally included post-retirement
> health care benefits in the [original CAS 412] [which defined "supplemental
> plans."] . . .  Others believe this clause was added to address . . . the
> combination of a defined benefit with a defined contribution plan, which were
> commonly referred to as "floor-offset plans.". . .  There is no evidence that
> post-retirement health care benefits were a consideration in the mid-1970s
> when [CAS 412] and [CAS 413] were originally promulgated. However, this
> language does raise the question of whether separate accounts within a
> qualified pension trust established for [Section] 401(h) health care benefits
> should be considered as providing an ancillary benefit that is an integral part
> of a pension plan that covers the same population.

Id. at 49,537-38 (internal brackets omitted).

In seeking public input, the Staff Paper identified several critical issues that it would need to address before it could devise a standard, including the "Validity of the Liability as a Prerequisite for Accrual Accounting." Id. The Staff Paper explained, "the CASB will have to assess the validity of the estimated liability." Id. at 49,540. Recognizing the authority of contractors to modify or terminate most PRBs, the CASB expressed concern with the "possibility of a retiree health benefit being greatly reduced or eliminated." Id. The CASB also identified segment closings as a topic of concern and asked for comments on whether the government should assume liability for unfunded PRB plans. Id. at 49,542.

In October 2000, after considering comments it received on the Staff Paper, the CASB published an Advanced Notice of Proposed Rulemaking ("ANPRM"), 65 Fed. Reg. 59,503 (Oct. 5, 2000). In the ANPRM, the CASB proposed a funding requirement and a vested lifetime or nonforfeitability requirement on PRB costs. Under the ANPRM, only contractors that could establish that their post-retirement benefits created a firm liability would be permitted to allocate their PRB costs to government contracts. See id. at 59,506 ("The [CASB] believes that accrual accounting is the appropriate method for determining the costs of post-retirement benefit plans that create a sufficiently firm liability for contract cost recognition"); Id. at 59,516 ("The [FAS 106] definition is intended to identify any potential liability for financial accounting disclosure purposes. For contract cost accounting purposes, the [CASB] believes there must be a greater

expectation that the benefits will ultimately be paid to the employees. The [CASB]

concludes that, at a minimum, when accrual accounting is used for contract cost

accounting, the benefits must be described in a formal written document, the right to the

benefits must be communicated to the plan participants, and the benefit must be

materially nonforfeitable once eligibility is attained.").  Thus, under the standard

proposed in the ANPRM, companies that provided PRBs that could be terminated at will

by the employer without any reason could not be accounted for under the proposed CAS.

Under such a standard, most PRBs costs would not be reimbursed.

The CASB received strong objections to the ANPRM and in September 2003

decided to discontinue the development of a Cost Accounting Standard for PRBs.  In the

discontinuation notice, the CASB explained its reasons for discontinuing its efforts.  First,

it noted the negative public comments it received regarding the requirement that benefits

could not be terminated or modified at any time for any reason (i.e., nonforfeitable

benefits), stating,

> [T]he continuing high level of medical inflation coupled with various
> economic factors[ ] and global competition, raises the question whether any
> contractor could risk the adverse effects of providing any level of
> nonforfeitable benefits.  The argument has been made that the only prudent
> way of providing some assurance that some level of benefit will be available
> in the future, is for a contractor to currently fund the accrued cost as permitted
> by existing procurement regulations.[18]

68 Fed. Reg. 53,312, 53,312 (Sept. 10, 2003).

---

[18]As discussed infra, the FAR was amended in 1991 to make PRB costs allowable and payable
without requiring vesting. See 56 Fed. Reg. 29,124, 29,128.

Second, the CASB discussed several studies that had been published after

promulgation of the ANPRM which indicated that the costs of PRBs were rising and that

employers were no longer offering the same level or type of retiree health benefits

because of cost concerns.  Based on the comments it received and studies it reviewed, the

CASB concluded as follows:

> Because contractors need the flexibility to modify, reduce, or even eliminate
> post-retirement benefits in the future in response to the pressures of medical
> inflation, an aging population, and global competition, the [CASB] finds that
> the liability for post-retirement benefits cannot be made sufficiently firm to be
> recognized for government cost accounting purposes without undue financial
> risk to both the contractor and the government.  Therefore, the [CASB] has
> decided to discontinue further development of the rule proposed in the
> ANPRM.

Id. at 53,314.

## III.    The FAR and Post-Retirement Benefits

Although the CASB elected not to issue a specific standard for post-retirement

benefits, the Civilian Agency Acquisition Council and the Defense Acquisition

Regulatory Council (collectively, "the Councils"), who, together, are responsible for

promulgating the FAR, addressed the treatment of PRBs shortly after FAS 106 was

promulgated.  On June 25, 1991, Section 31.205-6 of the FAR was amended by adding

paragraph (o) as follows:

> (o) Postretirement benefits other than pensions (PRB). (1) PRB covers
> all benefits, other than cash benefits and life insurance benefits paid by
> pension plans, provided to employees, their beneficiaries, and covered
> dependents during the period following the employees' retirement. Benefits
> encompassed include, but are not limited to, postretirement health care; life

insurance provided outside a pension plan; and other welfare benefits such as tuition assistance, day care, legal services, and housing subsidies provided after retirement.

(2) To be allowable, PRB costs must be reasonable and incurred pursuant to law, employer-employee agreement, or an established policy of the contractor. In addition, to be allowable in the current year, PRB costs must be paid either to (i) an insurer, provider, or other recipient as current year benefits or premiums, or (ii) an insurer or trustee to establish and maintain a fund or reserve for the sole purpose of providing PRB to retirees. The costs in paragraph (o)(2)(ii) of this subsection must also be calculated in accordance with generally accepted actuarial principles and practices as promulgated by the Actuarial Standards Board, and be funded by the time set for filing the Federal income tax return or any extension thereof. PRB costs assigned to the current year, but not funded or otherwise liquidated by the tax return time, shall not be allowable in any subsequent year.

48 C.F.R. § 31.205-6 (1991) (emphasis added).

In June 2003, the Councils proposed amendments to 31.205-6(o) to address, in part, refunds and credits with regard to PRBs. See 65 Fed. Reg. 33,326, 33,326-27 (June 3, 2003). In particular, the proposed rule provided:

(3) The Government shall receive an equitable share of any amount of previously funded PRB costs which revert or inure to the contractor. Such equitable share shall reflect the Government's previous participation in PRB costs through those contracts for which cost or pricing data were required or which were subject to subpart 31.2. The contractor shall credit the equitable share to the Government either as a cost reduction or by cash refund at the option of the Government.

Id. at 33,327.

The amendment regarding the reversion of PRB costs was finalized on June 8, 2005. See 70 Fed. Reg. 33,671 (June 8, 2005). In the preamble to the final rule, the Councils addressed comments they had received to the proposed revision and provided

-24-

the following response to comments suggesting that the provision is "one-sided" and

recommending that "the provision require the Government to receive a pro-rata share of

the unfunded liability that exists at the time of a segment closing." Id. at 33,672.  The

Councils provided the following response:

> The Councils do not believe that FAR 31.205-6(o)(3) should be revised to
> provide a segment closing adjustment for PRB costs. Unlike pension benefits,
> contractors generally reserve the right to reduce or eliminate PRB benefits.
> Therefore, the Councils do not believe an adjustment similar to the pension
> segment closing adjustment is appropriate for PRBs.

Id.

> The finalized FAR provision reads:

> The Government shall receive an equitable share of any amount of previously
> funded PRB costs which revert or inure to the contractor.  Such equitable share
> shall reflect the Government's previous participation in PRB costs through
> those contracts for which cost or pricing data were required or which were
> subject to Subpart 31.2.

48 C.F.R. § 31.205-6(o)(5) (2005).[19]

## DISCUSSION

I.   **Only "Pension Costs" Are Included in a CAS 413 Segment Closing
     Adjustment.**

At the core of Raytheon's claim is its contention that the PRB costs it incurred in

connection with its government contracts were "pension costs" within the meaning of

CAS 412 and therefore those costs are subject to a segment closing adjustment under

CAS 413.  As the Federal Circuit explained in Allegheny Teledyne, "'the purpose of the

---

[19]Subsequent amendments to FAR § 31.205-6 did not affect this provision.

CAS 413 segment closing adjustment is to identify where the government may have over

or under contributed to <u>pension costs</u> under prior contracts'" and to then provide for a

settling up of the difference.  <u>Allegheny Teledyne</u>, 316 F.3d at 1381 (quoting <u>Teledyne</u>,

50 Fed. Cl. at 180) (emphasis added).

Because CAS 413 is aimed at adjusting previously determined pension costs, the

critical inquiry in this case is whether Raytheon's PRB costs are "pension costs" within

the meaning of CAS 412 and CAS 413.  For the reasons set forth below, the court

concludes that Raytheon's PRB costs are not "pension costs" within the meaning of CAS

412 and CAS 413 and therefore Raytheon's PRB costs are not subject to a segment

closing adjustment.

<u>A.</u>   <u>Raytheon's PRB Plans Funded through 401(h) Accounts Are Not "Integral"
to a Pension Plan within the Meaning of CAS 412 or CAS 413 and Cannot
Be Included as Pension Costs in a CAS 413 Segment Closing Adjustment.</u>

Raytheon contends that some of its PRB costs fall within the express terms of the

definition of pension costs under CAS 412.30(a)(20) and CAS 413.30(a)(12).  In

particular, Raytheon argues that the health benefits it provides to retirees with funds set

aside in 401(h) accounts meet the definition of "additional benefits" that are "integral" to

Raytheon's basic pension plans, as provided for in CAS 412 and CAS 413, as follows:

> Pension plan means a deferred compensation plan established and maintained
> by one or more employers to provide systematically for the payment of benefits
> to plan participants after their retirement, provided that the benefits are paid
> for life or are payable for life at the option of the employees.  <u>Additional
> benefits such as permanent and total disability and death payments, and
> survivorship payments to beneficiaries of deceased employees may be an</u>

integral part of a pension plan.

CAS 412.30(a)(20), 48 C.F.R. § 9904.412-30(a)(20); CAS 413.30(a)(12), 48 C.F.R. § 9904.413-30(a)(12) (the definition is identical in both sections) (emphasis added).  If the benefits paid for through 401(h) accounts are pension costs, Raytheon asserts, the costs associated with those benefits must be included as pension costs under CAS 412.  In addition, those costs are subject to a segment closing adjustment under CAS 413.

The government argues, in response, that Raytheon's PRB plans funded under Section 401(h) do not provide "additional benefits" that are "integral" to a pension plan within the meaning of CAS 412 and CAS 413.  The government contends that under the regulatory definition, the terms "additional benefits" and "integral" must be construed in light of the ERISA backdrop against which CAS 412 was promulgated and that when these terms are viewed in that context, it is clear that the "additional benefits" that are deemed "integral" to a pension plan are only those benefits that are actually paid out of the same ERISA account used to pay for retirement benefits.  The government contends that the examples provided by the CASB in the regulation only involve pension benefits that are recognized as basic pension benefits under ERISA.  Raytheon's health benefits, in contrast, are not paid for by the vested ERISA account which pays for basic pension benefits.  Thus, the government argues, benefits provided through 401(h) accounts are different from the basic pension benefits that are protected under ERISA and are not "integral" to the basic pension plan.

The court agrees with the government.  Raytheon's health benefits paid for through a 401(h) account are not "additional benefits" that are "integral" to Raytheon's basic pension plan.

The starting point of the court's analysis is the plain words of the definition of "pension plan" in both CAS 412 and CAS 413.  The definition, which is the same in both CAS 412 and CAS 413, provides that "[a]dditional benefits such as permanent and total disability and death payments, and survivorship payments . . . may be an integral part of a pension plan."  CAS 412.30(a)(20), 48 C.F.R. § 9904.412-30(a)(20); CAS 413.30(a)(12), 48 C.F.R. § 9904.413-30(a)(12) (the definition is identical in both sections).  It is notable that this list of specific benefits does not include health or medical benefits.  As neither health benefits nor medical benefits are included in this list, they can be considered "integral" to Raytheon's defined benefit pension plans only if the phrase "additional benefits" can be interpreted to encompass them.  For the reasons that follow, the court finds that health benefits, including those provided through a 401(h) account, are not the type of "additional benefits" that are "integral" to a pension plan.

The court finds, contrary to Raytheon's contentions, that the list of "additional benefits" following the phrase "such as" in the CAS 412 and CAS 413 definition was not intended to be a list of illustrative examples.  Rather, "permanent and total disability and death payments, and survivorship payments" are recognized as a specific class of "benefits" that can become vested.  If provided in a defined benefit pension plan, these

benefits will be protected in the event of termination of the plan by the Pension Benefit

Guarantee Corporation ("PBGC") under ERISA.  As discussed above, under ERISA, a

distinction is drawn between "pension plans" and "welfare benefit plans."  Only the

benefits provided for in "pension plans" vest and are protected under ERISA.  See

Nachman, 446 U.S. at 376-78.  The reason that total disability, death and survivor

benefits may be "integral" to a pension plan is because in some instances, total disability,

death and survivor benefits are derived from a plan participant's rights to the pension

retirement benefit that ERISA was designed to protect.  See, e.g., United Foods, Inc. v.

W. Conference of Teamsters Pension Trust Fund, 816 F. Supp. 602, 607-10 (N.D. Cal.

1993), aff'd, 41 F.3d 1338 (9th Cir. 1994) (explaining, in the context of examining the

withdrawal liability of a party from a multiemployer pension plan, that certain death and

disability benefits are directly related to the vested pension plan and are therefore

protected under ERISA and by the PBGC).  The types of benefits that may be included

and protected as vested benefits under ERISA are described in the leading text on

pensions, Fundamentals of Private Pensions, as follows:

> The PBGC is authorized to provide insurance coverage for both basic and
> nonbasic benefits.  Coverage for basic benefits is mandatory if the benefits are
> otherwise eligible for protection, whereas insurance of nonbasic benefits is
> optional. . . . In a nutshell, a basic benefit is any retirement benefit that was
> nonforfeitable [vested] on the date of plan termination and any death, survivor
> or disability benefit that was owed or in payment status at the date of plan
> termination. . . . Nonbasic benefits would presumably include death and
> disability benefits not treated as basic benefits, monthly retirement benefits in
> excess of the amount that can be insured as basic benefits, medical insurance
> premiums and benefits, and other more unusual benefits that might emerge

from the collective bargaining process. Thus far the PBGC has made no
arrangements to insure nonbasic benefits, and there is no indication it intends
to do so.

Dan M. McGill et al., <u>Fundamentals of Private Pensions</u> 575-76 (9th ed. 2010) (emphasis

added).  <u>See also</u> PBGC Reg. 4022.2, 29 C.F.R. § 4022.2 (2003) ("Pension benefit means

a benefit payable as an annuity, or one or more payments related thereto, to a participant

who permanently leaves or has permanently left covered employment, or to a surviving

beneficiary, which payments by themselves or in combination with Social Security,

Railroad Retirement, or workmen's compensation benefits provide a substantially level

income to the recipient."); PBGC Reg. 4022.3, 29 C.F.R. § 4022.3 (2003) ("Except as

otherwise provided in this part, the PBGC will guarantee the amount, as of the

termination date, of a benefit provided under a plan . . . if . . . (a) The benefit is, on the

termination date, a nonforfeitable benefit; (b) The benefit qualifies as a pension benefit as

defined in § 4022.2; and (c) The participant is entitled to the benefit . . . .").

       In view of the foregoing, the court finds that the CAS Board in defining "pension

plan" to include "permanent and total disability and death payments, and survivorship

payments" intended to cover the specific benefits that were recognized under ERISA as

benefits that could vest as derivative of the basic pension benefit and also would be

protected under ERISA.

       It is for these reasons that health benefits or medical benefits, which clearly do not

vest and are terminable at will, are not "integral" to a pension plan.  First, as the

-30-

government correctly argues, a 401(h) account is separate from the fund account that pays basic retirement benefits. Second, the health or medical benefits offered by Raytheon do not vest, whereas the total disability, death and survivor benefits that are included as part of a basic pension plan can vest and if they do, they are given the same legal protections that are provided for the basic pension benefit. This includes protection by the PBGC in the event of plan termination. Health benefits, including those funded under Section 401(h), are used to fund health or medical benefit plans that are terminable at will and are not protected by the PBGC under ERISA.

The fact that Raytheon must use the money it has accumulated in a 401(h) account to pay for health benefits does not alter this conclusion. The fact that funds in 401(h) accounts must be used to pay for health benefits does not mean that the health benefits are "vested" or "protected" in the same way that benefits integral to a pension plan are. Raytheon is not required to put any funds into the 401(h) account. Should it choose to no longer contribute to this account, there is nothing to keep Raytheon from then terminating its obligation to pay health benefits once the funds in the account are spent.[20] Raytheon does not dispute the fact that it can terminate its PRB plans funded through 401(h)

---

[20] Raytheon's contention that the court should include the health benefits funded through a 401(h) account the same as total disability, death and survivor benefits, because they are not terminable to the extent the 401(h) account is funded is not supported. It is true that under Section 401(h), an employer cannot terminate the account and recoup the funds remaining in a 401(h) account absent "the satisfaction of all liabilities under the plan to provide [sickness, accident, hospitalization, and medical] benefits." 26 U.S.C. § 401(h)(5) (2006). However, nothing in ERISA requires an employer to continue to fund a 401(h) account or prevents an employer from terminating benefits after all of the funds in the account are expended.

accounts at any time and for any reason.  Thus, even if the list of additional benefits in the

CAS definition of "pension plan" were non-exclusive, the health benefits funded through

a 401(h) account would remain legally distinguishable from those benefits identified as

"additional benefits" under CAS 412 and CAS 413.  It is for these reasons, as well, that

Raytheon's health PRBs are not "integral" to a pension plan under CAS 412 and CAS

413.

Accordingly, the court agrees with the government that Raytheon's PRBs funded

through a 401(h) account are not "additional benefits" that are "integral" to the pension

plan within the meaning of CAS 412.30(a)(20) or CAS 413.30(a)(12).  Thus, the costs

associated with those health benefits are not "pension costs" subject to a segment closing

adjustment under CAS 413.50(c)(12).

B.    Raytheon's PRB Plans Are Not "Supplemental" Pension Plans under CAS
      412 and Cannot Be Included as Pension Costs under CAS 413.

CAS 412.50(a)(7), 48 C.F.R. § 9904.412-50(a)(7) (2010),[21] provides:

> If a pension plan is supplemented by a separately-funded plan which provides
> retirement benefits to all the participants in the basic plan, the two plans shall
> be considered as a single plan for purposes of [CAS 412].  If the effect of the
> combined plans is to provide defined-benefits for the plan participants, the
> combined plans shall be treated as a defined-benefit plan for purposes of [CAS
> 412].

Raytheon contends that regardless of whether its PRB plans provide "additional benefits"

---

[21]See 40 Fed. Reg. 43,873, 43,879 (the original version of CAS 412.50(a)(9)); 48 C.F.R. §
9904.412-50(a)(7) (the current version, containing an identical definition).  Prior to 1995, this
section was numbered 412.50(a)(9).  As stated above, the language of the provision did not
change with the renumbering.

that are "integral" to the basic pension plan under CAS 412.30(a)(20), the PRB plans are plainly "supplemental" to Raytheon's basic pension plans under the plain language of CAS 412.50(a)(7).  More specifically, Raytheon argues that the PRB plans are "separately funded" and provide "retirement benefits" to "all of the participants of the basic plan." Therefore, according to Raytheon, its PRB plans and basic pension plans must be treated as a single plan under the Standard and the costs from both types of plans must be included in the CAS 413 segment closing adjustment.

The government argues in response that Raytheon's reliance on CAS 412.50(a)(7) with regard to "supplemental" plans is misplaced.  The government asserts that the discussion of supplemental plans in CAS 412 is intended to cover the specific situation where a defined contribution plan and defined benefit plan are both offered to employees. The government contends that in such circumstances, CAS 412 allows the contractor to characterize the plan as a single "defined benefit" pension plan for purposes of the standard.  According to the government, the subject provision does not encompass benefits that are different in kind from the basic pension plan, such as PRB plans.  In support of this assertion, the government relies upon the illustration provided in the next CAS 412 section (discussed infra), which addresses the treatment of pension plans made up of a combination of both defined contribution and defined benefit plans, which, as mentioned above, are known as "floor-offset plans."[22]

---

[22] Floor offset plans or "floor plans" are described in Fundamentals of Private Pensions as follows:

The government also argues that Raytheon's PRB plan would not be supplemental in any case because Raytheon's PRB plans do not provide benefits to all of the participants in Raytheon's defined benefit pension plans, as required by CAS 412.50(a)(7).  See Def.'s Initial Post-Hr'g Br. on PRB Issue ("Def.'s Br.") 3.  The government argues, and Raytheon does not dispute, that because employees are not provided with a "vested" right to PRBs, it is possible that employees with vested rights in the basic pension plan who leave Raytheon before retirement will be entitled to pension benefits but those same employees will not be eligible for PRBs because they did not retire from Raytheon.  Thus, the government contends, Raytheon's PRB plans do not "provide" retirement benefits to the "same" employees in the basic plan, as mandated by CAS 412.50(a)(7).  Accordingly, the government argues, Raytheon's PRB costs may not be included in any CAS 413 segment closing adjustment.

The court finds that the government has the better reading of the regulation and that the supplemental plans identified in CAS 412.50(a)(7) do not encompass Raytheon's PRB plans.  While it is true that words in a regulation generally should be given their ordinary meaning, this rule of construction does not apply where the regulation provides a

---

[S]ome hybrid plans consist of both defined benefit and defined contribution plans to give participants the best features of both.  Such plans, usually known as floor-offset plans or floor plans, provide the defined benefit plan accrual as a minimum benefit (thus ensuring some benefit, the best feature of defined benefit plans), while giving employees the potentially positive investment returns on the amounts in the defined contribution plan.

McGill 397.

-34-

special meaning to the term.  See Elliot Coal Min. Co. v. Dir., Office of Workers'

Compensation Programs, 17 F.3d 616, 634 (3d. Cir. 1994) (We assume that [a term]

should be given its normal meaning unless it is apparent the Secretary has given some

artificial, technical meaning to it."); see also Fanning, Phillips, Molnar v. West, 160 F.3d

717, 721 (Fed. Cir. 1998) ("We also consider 'not only the bare meaning of the word but

also its placement and purpose in the statutory scheme.'" (quoting Bailey v. United States,

516 U.S. 137, 144 (1995)).  Here, the term "supplemental" must be interpreted in light of

the special meaning provided in the illustration accompanying the term in CAS

412.60(a)(3), 48 C.F.R. § 9904.412-60(a)(3) (2010).[23]  See Griffin v. Sec'y of Veterans'

Affairs, 288 F.3d 1309, 1330 (Fed. Cir. 2002) ("Challenged terms must be read in context

of the regulation as a whole[.]").  This illustration addresses the situation where a

contractor offers basic pension payments through an employee contribution plan but also

provides a guaranteed minimum monthly retirement income through a defined benefit

pension plan:

> Contractor D provides pension benefits for certain employees through a
> defined-contribution pension plan.  However, the contractor has a separate
> fund which is used to supplement pension benefits provided for all of the
> participants in the basic plan in order to provide a minimum monthly
> retirement income to each participant.  Pursuant to [CAS] 412.50(a)(7), the
> two plans shall be considered as a single plan for purposes of this Standard.
> Because the effect of the supplemental fund is to provide defined[ ]benefits for
> the plan's participants, the provisions of this Standard relative to defined-

---

[23]Prior to 1995, this provision was numbered 412.60(a)(4).  See 57 Fed. Reg. 14,153, 14,213
(Apr. 17, 1992) (reflecting the old numbering); 60 Fed. Reg. 16,544, 16,544 (Mar. 30, 1995)
(renumbering the provision).

benefit pension plans shall be applicable to the combined plan.

CAS 412.60(a)(3); 48 C.F.R. § 9904.412-60(a)(3).

This illustration demonstrates that the term "supplemental" in the context of CAS

412 was intended to address the situation where the same type of benefits are being

provided to employees by two different plans and the contractor is making contributions

to both.  In such circumstances, the regulation states, the two pension plans can be treated

as a single plan.  There is nothing in the language of CAS 412.50(a)(7) or the illustration

to suggest that it was intended to cover any PRB plans that involve benefits that are

different from basic pension benefits.  Without a clear indication from the language of the

regulations or the regulatory history to show that the CASB intended an expansive

reading of the term "supplemental plan" to include PRB plans, the court will not read the

provision outside the context of the rest of CAS 412 and the specific illustration provided.

See Griffin, 288 F.3d at 1331 ("Challenged terms must be read in context of the

regulation as a whole[.]").  The court finds that only those separately-funded pension

plans that offer retirement benefits through a defined benefit plan or defined contribution

plan to the same employees are covered under CAS 412.50(a)(7).[24]  Raytheon's PRB

---

[24]The court also agrees with the government that Raytheon does not provide PRBs to precisely the same group that receives basic pension benefits and, therefore, this is another reason why Raytheon's PRB plans are not supplemental to the basic pension plan.  See Def.'s Br. 7-11.  The government is correct that many Raytheon employees will leave the company sometime between when their pensions vest and when they ultimately retire.  Because Raytheon employees only receive PRBs if they stay with the company until retirement, there will be some people who receive basic pension benefits from Raytheon but not PRBs.  As a result, it is correct that Raytheon does not provide PRBs to "all the participants in the basic plan."  CAS 412.50(a)(7),

plans offer health and other benefits that are not of the same type as the retirement

benefits offered under the basic plan.  Therefore, the PRB plans are not supplemental to

the basic pension plan and the costs associated with the PRB plans cannot be included in

the CAS 413 segment closing adjustment.

**II.    The Regulatory History of Failed CAS 419 Supports the Conclusion That the Segment Closing Adjustment Provided for in CAS 413 Does Not Extend to PRB Plans That Provide Benefits That Can Be Terminated or Modified at Any Time and for Any Reason by the Employer.**

The conclusion that the CAS 413 segment closing adjustment does not include

PRB costs that can be terminated at will by the employer is also supported by the CASB's

actions and statements surrounding proposed CAS 419.  Starting with the Staff Paper in

1996 and continuing through to the decision in 2003 not to promulgate a separate CAS for

PRB plans, it is clear that the CASB did not believe that PRBs that can be modified or

terminated at the will of the employer are covered under the existing CAS 412 or CAS

413.

The regulatory history surrounding proposed CAS 419 reveals the CASB's intent to

establish a cost accounting standard only when the liability for PRBs is as certain as it is

for the retirement benefits provided for under a basic pension plan.  The CASB discussion

regarding the problems with authorizing a segment closing adjustment for PRBs that can

be terminated at the will of the employer plainly demonstrates that the existing CAS does

not include a standard for a segment closing adjustment for PRBs.  <u>See</u> 68 Fed. Reg.

---

48 C.F.R. § 9904.412-50(a)(7).

53,312.  Nothing has occurred subsequently to create a segment closing adjustment for

PRBs.  Therefore, given the CASB's decision not to create a standard for PRBs, the court

must conclude that no standard for such an adjustment exists today or at the time of the

segment closings.

The CASB's statements contained in its decision not to finalize CAS 419 cannot be

ignored by the court.  The CASB's decision not to promulgate a standard is well-reasoned

and explained.  The CASB concluded that in order to preserve employer options with

regard to providing PRBs it would not take action.  As the CASB discussed in the

discontinuation notice,

> Because contractors need the flexibility to modify, reduce, or even eliminate
> post-retirement benefits in the future in response to the pressures of medical
> inflation, an aging population, and global competition, the [CASB] finds that
> the liability for post-retirement benefits cannot be made sufficiently firm to be
> recognized for government cost accounting purposes without undue financial
> risk to both the contractor and the government.  Therefore, the [CASB] has
> decided to discontinue further development of the rule proposed in the ANPRM
> and the project . . . to develop a separate [CAS] that addresses the recognition
> of costs of post-retirement benefit plans under government cost-based contracts
> and subcontracts.

Id. at 53,314.

The CASB further stated that PRBs should be accounted and paid for as provided

for under the FAR.  As the CASB stated, "the only prudent way of providing some

assurance that some level of benefit will be available in the future, is for a contractor to

currently fund the accrued cost as permitted by existing procurement regulations."[25]  Id.

_____

[25]"Procurement regulations" are the FAR regulations.  See FAR 31.205-6, 48 C.F.R. § 31.205-6.

(emphasis added).

The court is mindful of established rules of administrative law which provide that proposed regulations have no legal effect and are not entitled to deference. See, e.g., Tedori v. United States, 211 F.3d 488 (9th Cir. 2001). The court is also mindful of established rules of construction that caution against relying on the views of a legislature to interpret the meaning of a law written by a previous legislature. See Gen. Motors Corp. v. United States, 78 Fed. Cl. 336, 347 (2007). However, there are situations where policy pronouncements are entitled to appropriate deference based on the context of the pronouncement. The court finds that this is one of those circumstances.

In this case the CASB did more than stop a rulemaking. The CASB issued a final agency decision to explain its decision. In other contexts, courts have recognized that a reasoned decision of an agency to maintain the status quo and not to regulate is entitled to deference. See, e.g., Consumer Fed'n of Am. v. Consumer Prod. Safety Com'n, 990 F.2d 1298, 1305 (D.C. Cir. 1993) (giving deference to the Consumer Product Safety Commission's decision to terminate a rulemaking process because the reasons for that decision were well-documented and stating that "the degree of deference we properly give to the Commission in this case, while not 'extreme,' is 'very substantial.'"). The court believes that similar deference is owed to the CASB in this case.

The CASB reasoned that if it were to establish CAS rules for the accounting and allocation of PRB costs, it would have to require vesting and that this would change the

status quo with regard to most contractors' PRB plans.  The CASB further explained that

doing away with a contractor's right to modify or terminate PRB plans at will would

remove the flexibility contractors need to address changing economic circumstances.

Thus, the CASB concluded that it would not regulate PRBs, but would instead leave the

job of accounting for PRBs to the procurement agencies through the FAR.  This reasoned

policy decision by the CASB should be given deference.  See United States v. Mead, 533

U.S. 218, 234 (2001) (holding that pursuant to Skidmore v. Swift & Co., 323 U.S. 134

(1944), "[A]n agency's interpretation may merit some deference whatever its form, given

the 'specialized experience and broader investigations and information' available to the

agency, and given the value of uniformity in its administrative and judicial understandings

of what a national law requires." (quoting Skidmore, 323 U.S. at 140 (internal citation

omitted))).  See generally Metro. Stevedore Co. v. Rambo, 521 U.S. 121, 136 (1997)

(reasonable agency interpretations carry "at least some added persuasive force" where

Chevron U.S.A. v. Nat'l Res. Def. Council, 467 U.S. 837 (1984), is inapplicable); Reno v.

Koray, 515 U.S. 50, 61 (1995) (according "some deference" to an interpretive rule that

"do[es] not require notice and comment"); Martin v. Occupational Safety & Health

Review Comm'n, 499 U.S. 144, 157 (1991) ("some weight" is due to informal

interpretations, though not "the same deference as norms that derive from the exercise of .

. . delegated lawmaking powers").

**III.    The Payment of PRB Costs Is Governed by the FAR.**

Because the CAS does not extend to the measurement and allocation of PRB

costs, Raytheon's right to reimbursement for these costs is governed by the FAR.  As

noted above, the Federal Circuit has made it plain that the FAR will govern whether any

costs will be allowed and paid.  Boeing, 298 F.3d at 1284.

Under the FAR, PRB costs that are accrued during the working lives of employees,

like Raytheon's, are to be measured and assigned according to generally accepted

accounting principles ("GAAP"), which in this case is FAS 106.[26]  See 48 C.F.R. §

31.205-6(o)(iii)(A).

As part of FAR 205-6(o), the FAR also states that the government is entitled to an

equitable share of any previously funded PRB costs that revert or inure to the contractor

following a decision to reduce or eliminate PRB benefits.  48 C.F.R. §

31.205-6(o)(2)(iii)(G)(5) (2010) ("The Government shall receive an equitable share of any

amount of previously funded PRB costs which revert or inure to the contractor.  Such

equitable share shall reflect the Government's previous participation in PRB costs through

those contracts for which cost or pricing data were required or which were subject to

Subpart 31.2.").

Before subpart (o)(6) was finalized, the Councils considered comments to the

proposed version regarding the need to provide for a segment closing adjustment for PRBs

---

[26]FASB statements are considered to be a component of GAAP.

that can be modified or terminated at will by an employer.  As discussed above,

commentors recommended that the government should be required to pay a "fair share" of

underfunded PRB plans in the event of a segment closing.  In response to those comments,

the Councils stated:

> The Councils do not believe that FAR 31.205-6(o)(3) should be revised to
> provide a segment closing adjustment for PRB costs.  <u>Unlike pension benefits,
> contractors generally reserve the right to reduce or eliminate PRB benefits.
> Therefore, the Councils do not believe an adjustment similar to the pension
> segment closing adjustment is appropriate for PRBs.</u>

70 Fed. Reg. 33,671, 33,672 (emphasis added).

The court must give deference to the Councils' decision not to allow for a segment

closing adjustment for PRBs in the final version of subpart (o)(6).  The Councils are

entitled to the highest degree of deference with regard to decisions made after notice and

comment rulemaking.  <u>Mead</u>, 533 U.S. 218.

In view of the foregoing discussion, the court concludes that under the FAR the

government is not authorized to pay, as part of a segment closing, a lump-sum share of

underfunded PRB plans where those plans can be modified or terminated at will by the

employer.

**IV.    Raytheon Will Be Able to Allocate its PRB Costs for Its Closed Segments As
"Residual Costs" under CAS 403.40(c).**

The fact that Raytheon's PRB costs are not included in the CAS 413.50(c)(12)

segment closing adjustment does not mean that Raytheon will not be able to recover its

PRB costs from the government following these segment closings.  To the extent

-42-

Raytheon continues to fund its PRBs, it will be able to allocate its PRB costs across all of its remaining segments under CAS 403.40(c), 48 C.F.R. § 9904.403-40(c) (2010).[27]  The government has agreed to allow contractors that continue to generate PRB costs to allocate those costs to the government as residual costs under other contracts following a segment closing.

At oral argument, Raytheon challenged the government's interpretation of CAS 403.  In particular, Raytheon suggested that under CAS 403, costs incurred for the same purpose must be treated the same and therefore PRB costs, if they are the same as pension costs, must be treated the same as pension costs and cannot be charged as residual costs but must be allocated to a segment.  See CAS 403.40(a)(2), 48 C.F.R. § 9904.403-40(a)(2) (2010) ("No segment shall have allocated to it as an indirect cost, either through a homogeneous expense pool, or the residual expense pool, any cost, if other costs incurred for the same purpose have been allocated directly to that or any other segment.").  Raytheon argued that if the government later decides that PRB costs and pension costs were "incurred for the same purpose," the government may decide that it will not allow

_____

[27]CAS 403.40(c) states, in pertinent part,

> All home office expenses which are not allocable in accordance with paragraph (a) of this subsection and paragraphs (b)(1) through (b)(5) of this subsection shall be deemed residual expenses. . . . Residual expenses shall be allocated to all segments under a home office by means of a base representative of the total activity of such segments[.]"

CAS 403.40(c)(1), 48 C.F.R. § 9904.403-40(c)(1) (2010).

Raytheon to allocate PRBs as residual costs.

The court finds that Raytheon's fears regarding the government's application of CAS 403 are unfounded.  First, the government has stated that Raytheon can allocate its PRB costs as residual costs.  Second, for the reasons stated above, the court has determined that PRB costs are not incurred for the same purpose as pension costs.  Rather, PRBs are incurred for a different purpose than pension costs and therefore PRB costs and pension costs are properly treated differently under CAS 403.40(a)(2).  Thus, they may be treated differently under the CAS.  In particular, pension costs are incurred to provide a vested and protected right for a specific form of pension payment upon retirement, or if offered, upon total disability or death.  Raytheon's PRBs, in contrast, are not vested but are paid after a Raytheon employee retires from Raytheon.  Thus the benefits are forfeitable (i.e., if the employee leaves before retirement, he or she will not receive these benefits).  In addition, in contrast to pension benefits, Raytheon's PRBs can be terminated at will and are not protected by law in the event Raytheon's plan comes under PBGC supervision. These distinctions in the security of pension benefits versus PRBs demonstrates that they are not "incurred for the same purpose" and therefore the benefits may be treated differently without violating CAS 403.

Accordingly, Raytheon will be legally allowed to allocate the PRB costs associated with its closed segments in accordance with CAS 403.40(c) and have them paid in accordance with the FAR provisions discussed above.

## CONCLUSION

For all of the above-stated reasons, the government's motion for partial summary judgment is **GRANTED**.  Raytheon's motion for partial summary judgment is **DENIED**. The parties shall provide the court with a joint status report by **May 27, 2010** detailing the next steps to be taken to resolve the remaining issues in dispute.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge